VMARK SOFTWARE, INC. *vs.* EMC CORPORATION.

No. 92-P-1825.

Middlesex. January 7, 1994. - November 18, 1994.

Present: FINE, PORADA, & LAURENCE, JJ.

*Fraud. Damages*, Deceit, Consumer protection case. *Consumer Protection Act*, Unfair or deceptive act, Businessman's claim, Damages.

At a civil trial, the judge properly ruled in the defendant's favor, but he should have made an award of damages on the counts of the counterclaim alleging misrepresentation and violation of G. L. c. 93A, where his unchallenged findings of fact, based on undisputed evidence, supported such an award. [616-620]

The evidence at a civil trial on claims for misrepresentation and violation of G. L c. 93A did not support an award of multiple damages. [620-624]

CIVIL ACTION commenced in the Superior Court Department on January 11, 1991.

The case was heard by *Herbert Abrams*, J.

*Anthony A. Bongiorno* for the plaintiff.

*James C. Burling* for the defendant.

LAURENCE, J. A common but foreseeable frustration of modern life — the failure of new computer hardware or software to work properly — produced this commercial altercation, which the parties unfortunately failed to anticipate by a contractual dispute resolution mechanism that might have avoided their time-consuming and expensive litigation. The controversy arose out of the June, 1990, grant by VMark Software, Inc. (VMark), of a license to EMC Corporation (EMC) to use VMark's software product, a relational database management system called "uniVerse."[1] EMC

_____

[1]The parties and the trial judge assumed, without discussion, that the parties' computer software license agreement is governed by art. 2 of the Uniform Commercial Code, G. L. c. 106, §§ 2-101 et seq. Although the

looked upon uniVerse as a vital product for its expanding business. According to VMark's representations, uniVerse would enable EMC to replace existing computer hardware that no longer had the capacity to meet its computing needs, while allowing it to retain its valuable application software, which uniVerse would render compatible with many different types of more efficient or versatile hardware.

When uniVerse failed to function as VMark had represented and EMC had anticipated, despite at least twenty remedial efforts by VMark, EMC unilaterally declared the license agreement terminated and refused to pay the license fee. VMark's suit to recover that fee provoked a counterclaim by EMC seeking damages for VMark's failure to deliver a functional product, founded upon counts for breach of contract, breach of warranty, promissory estoppel, misrepresentation, and violation of G. L. c. 93A.

Following a ten-day bench trial, a judge of the Superior Court — in a fifty-five page opinion containing 144 separate findings of fact that are unchallenged by the parties — ruled against VMark on its claim for payment, against EMC on its breach of warranty, misrepresentation, and c. 93A counts, but for EMC on its breach of contract and promissory estoppel claims. The judge awarded EMC $316,901 in what he termed "reliance damages."[2] That figure essentially reflected

issue has not been definitively decided in Massachusetts, we accept the assumption, particularly since the applicability and provisions of the U.C.C. are not critical to our analysis. See *USM Corp.* v. *First State Ins. Co., ante* 471, 477-479 (1994). See generally Note, Computer Programs as Goods Under the U.C.C., 77 Mich. L. Rev. 1149 (1979); Note, Computer Software as a Good Under the Uniform Commercial Code: Taking a Byte Out of the Intangibility Myth, 65 B.U.L. Rev. 129 (1985).

[2] The long-established general rule for breach of contract recovery in Massachusetts is that the wronged party should receive the benefit of his bargain, i.e., be placed in the same position as if the contract had been performed. *John Hetherington & Sons, Ltd.* v. *William Firth Co.,* 210 Mass. 8, 21 (1911). However, in an appropriate case, Massachusetts law permits, as an alternative to such "expectation" damages, the recovery of "reliance" damages, i.e., expenditures made in reliance upon a contractual obligation that was not performed. See *Albre Marble & Tile Co.* v. *John Bowen Co.,* 338 Mass. 394, 398-399 (1959); *Brennan* v. *Carvel Corp.,* 929 F.2d 801, 810-811 (1st Cir. 1991); Restatement (Second) of Contracts

the net cost to EMC of certain Digital Equipment Corporation (DEC) computer hardware EMC had purchased in reliance on VMark's supplying it with a software product that would be fully functional in conjunction with that hardware.

Neither party was satisfied with the judge's determinations, and both appealed. VMark challenges the judge's award of reliance damages on either of EMC's theories. VMark argues that the license agreement contained damage limitation provisions restricting EMC's damages to those attributable to VMark's negligence and that promissory estoppel recovery is inappropriate when the parties' relationship is governed by a valid, fully integrated contract. EMC's principal cross-appeal argument is that the judge's adverse rulings on its misrepresentation and c. 93A charges are inconsistent with his undisputed subsidiary findings which establish the requisite elements of those claims in EMC's favor.[3]

Our analysis persuades us that the judge properly ruled in EMC's favor but should have done so on the basis of EMC's misrepresentation and c. 93A claims. Our conclusion makes it unnecessary to expound upon VMark's arguments against the judgment entered in favor of EMC on its breach of contract and promissory estoppel counts.

*Background Facts.* The following narrative is based upon the judge's findings. In early 1990, EMC foresaw its imminent need for expanded computing capability. A manufacturer of add-on computer products known as "peripherals,"

---

§ 349 (1981). Such a measure of damages, which is designed to place a plaintiff "in as good a position as he would have been in had the contract not been made," *Hastoupis* v. *Gargas*, 9 Mass. App. Ct. 27, 35 n.6 (1980), is essentially similar to the tort standard of actual, or out-of-pocket, loss proximately suffered. See Nolan & Sartorio, Tort Law § 146 (1989). Cf. *Sullivan* v. *O'Connor*, 363 Mass. 579, 583-586 & n.5 (1973). In this case, EMC expressly sought only reliance, rather than expectation, damages for VMark's claimed breach of contract, requesting only its costs incurred in reliance on VMark's promise to supply a functional product.

[3]EMC also contends that the judge's award of contractual reliance damages should have included the value of the time spent by its employees in their vain struggles to convert data to the DEC/uniVerse system and otherwise utilize the defective uniVerse product. We agree, as discussed below, although by way of a different legal analysis.

EMC sought an improved software product for managing its financial reporting, order management, production, and inventory tracking. At that time, EMC used a Prime computer system for those needs, but that system had become "saturated," forcing EMC to investigate various alternative systems to handle its expanding business data more quickly and efficiently. EMC required a system that would support both dynamic files[4] and alternate indices,[5] standard features of EMC's original Prime system. After a preliminary exploration of alternatives, EMC became interested in the possibility of replacing its Prime system with a "DEC Ultrix" system. EMC, however, used and wanted to continue to use a business applications software called "Madic" for its accounting, inventory, manufacturing, and financial needs, which was incompatible with the DEC Ultrix system.

EMC consequently sought a product that would enable it to retain the Madic software while using it on the DEC Ultrix hardware. VMark had developed and was licensing such a product, uniVerse, which it marketed to users, like EMC, who sought to move their applications software designed for a Prime system to other, more flexible or capacious systems. One advertised feature of the uniVerse software was its supposed ability to convert existing data files that run in a Prime environment to files that run in a uniVerse environment. UniVerse also was designed to support alternate indices and dynamic files, functions required by EMC.

In the spring of 1990, EMC approached VMark as a potential licensee of uniVerse. EMC gathered information about uniVerse and its capabilities through product demonstrations, reference checks, and a thorough review of uniVerse's operating manuals. During this process, EMC told VMark that its primary concerns in using uniVerse to replace its Prime system with a DEC system were processing its business data more quickly and efficiently, being able to

---

[4]Dynamic files enable the system to run continually, continuously twenty-four hours a day, every day.

[5]Alternate indices allow users to sort information by multiple criteria, such as name, purchase order number, or part number.

continue to use dynamic files and alternate indices in its database, and being able to convert to the DEC system by October, 1990, because of the limitations of its Prime system.

VMark officials assured EMC that the uniVerse product supported the use of both dynamic files and alternate indices, that the conversion from Prime to uniVerse would be straightforward and nonproblematic, and that the conversion process could be completed before the end of the summer. At one of the demonstrations, the VMark sales representative additionally assured EMC that, if uniVerse did not function as promised, VMark would be responsible for the cost of the DEC hardware. By late June, 1990, EMC, relying on VMark's several representations as to uniVerse's performance and capabilities, had decided to obtain a license for uniVerse and to purchase the DEC Ultrix computer system. EMC would not have purchased the DEC hardware had it not also acquired what it perceived to be fully functional uniVerse software.

At the time VMark personnel made their several representations regarding uniVerse, they were confident of EMC's successful application of the software but knew that there had been some prior problems with the performance of uniVerse when used with a DEC Ultrix system. They were also aware that such a combined system had thus far operated more slowly than it was designed to do; that there had been relatively little experience with uniVerse's ability to support the alternate indices function, which even the developer of uniVerse was concerned might not work as represented to EMC; that VMark had not actually attempted to use uniVerse to achieve compatibility between Madic application software and DEC hardware; and that difficulties had been encountered with the ability of uniVerse operationally to convert dynamic files to the DEC/uniVerse system. The necessary conversion process required, at the then-current stage of development, an extra, time-consuming step that both VMark's creator and its engineering vice president recog-

nized would make it difficult to meet EMC's initially desired timetable.

None of these problems was explicitly communicated by VMark to EMC during the demonstration and negotiation period. Instead, in keeping with VMark's apparent general policy of not mentioning or minimizing negative factors regarding uniVerse's capabilities to prospective customers, VMark personnel assured EMC that there would be no serious performance or conversion problems. Nor did the manuals and technical documents supplied by VMark to EMC highlight any of these problems relating to the use of uniVerse.

Unaware of these difficulties, and encouraged to act quickly by VMark's June 26, 1990, offer to give a twenty percent discount on the license fee if EMC signed up before the end of June, EMC soon thereafter executed a license agreement for the uniVerse software. This agreement contained various provisions limiting VMark's warranties and damage liability, which VMark asserts preclude any recovery by EMC.[6]

Despite VMark's assurance that the conversion and transfer of EMC's data stored in its Prime system to the DEC system via uniVerse would occur uneventfully, difficulties in using uniVerse to load and convert EMC's data were encountered almost immediately. When EMC performed test functions in uniVerse on the few files that were successfully converted, the results were not uniformly complete or accurate. The DEC/uniVerse system turned out to operate much more slowly than the Prime system. None of VMark's repeated efforts to solve the various performance problems over the summer and fall of 1990 succeeded in overcoming them. By December, 1990, EMC concluded that uniVerse was too unreliable to permit EMC to conduct business activities on it. By that time VMark, after failing to correct the defects in

---

[6]The parties addressed most of their analytical efforts here, as below, to the interaction and implications of these restrictive provisions, but they do not occupy our attention on our view of the case. See *infra* at 616-617 & 625.

the software despite delivering over twenty different but equally unsatisfactory versions of uniVerse to EMC, also conceded that uniVerse was not yet a fully functional product for EMC's purposes.

· VMark told EMC at that point that its future efforts had to be directed to correcting fundamental problems with the software and that it would be unable to address EMC's specific performance issues until sometime thereafter. Immediately following that concession by VMark of uniVerse's inability to perform as represented, EMC halted the uniVerse conversion effort and purchased a larger Prime system to address its computing needs. EMC communicated this action to VMark and demanded reimbursement for the cost of the DEC hardware and for the time EMC employees had spent on the failed conversion effort. VMark refused EMC's claim, demanded payment under the license agreement, and the instant litigation ensued as described earlier.[7]

The parties and the judge devoted most of their trial and appellate energies to the question of the extent to which the license agreement, particularly its liability limitation provisions, restricts EMC's ability to recover damages for VMark's undisputed breach of its limited contractual warranty obligations to deliver a functional product conforming to specifications and to repair any defects so that the product would work as promised. Discussion of those contractual and quasi-contractual issues is not necessary in view of our determination that the judge's damage award in favor of EMC was correct because of VMark's actionable misrepresentations regarding uniVerse. The damage award did not, however, go far enough, and EMC is entitled to additional recovery.

1. *Misrepresentation.* Although the judge entered judgment for VMark on count IV (intentional misrepresentation)

---

[7]"Experienced lawyers often caution clients not to sue customers who refuse to pay an invoice because of a reasonable complaint about the product. This case may be cited as an illustration of the soundness of that advice." *Alcan Aluminum Corp.* v. *Carlton Aluminum of New England, Inc.*, 35 Mass. App. Ct. 161, 162 n.4 (1993).

of EMC's counterclaim, he did not treat that count separately in his extensive memorandum. His dismissal of the misrepresentation claim appears to have emanated from his brief discussion and rejection of EMC's c. 93A claim, count VI. Without any amplification, he ruled that "VMark's representations [regarding uniVerse's capabilities] were neither intentional nor negligent, and its conduct did not 'attain a level of rascality that [would constitute a c. 93A violation]. . . ." This conclusory observation clashes discordantly with the judge's detailed factual findings.[8] Those unchallenged subsidiary facts demonstrate that VMark did make material misstatements during its negotiations with EMC, which relied on them to its detriment.[9]

The judge found, on undisputed evidence (much of it from VMark's own witnesses) that prior to execution of the license agreement: (a) VMark made glowing representations (at sales presentations, product demonstrations, and in product manuals) regarding the capabilities of the uniVerse software, particularly its supposed ability to make EMC's Madic applications software compatible with the DEC Ultrix hardware system, to convert EMC's data from Prime to a DEC system easily in a few weeks, and to support computer functions (including dynamic files and alternate indices) essential to EMC's business operations; (b) EMC considered those representations to be material to its decision to license uniVerse, purchase the DEC computer, and undertake the substantial conversion process; (c) VMark knew that EMC con-

---

[8]An appellate court may reach its own ultimate conclusions based on a trial judge's findings and may set aside a trial judge's ultimate ruling that is inconsistent with the judge's own subsidiary factual findings. *Simon* v. *Weymouth Agric. & Industrial Soc.*, 389 Mass. 146, 148-149, 151-152 (1983); *Delano Growers' Coop. Winery* v. *Supreme Wine Co.*, 393 Mass. 666, 684 (1985).

[9]The familiar elements of an action for misrepresentation are that the defendant made a false representation of a material fact for the purpose of inducing the plaintiff to rely upon it, and that the plaintiff did rely upon the representation as true, to his damage. See *Zimmerman* v. *Kent*, 31 Mass. App. Ct. 72, 77 (1991). The party making the representation need not know that the statement is false if the fact represented is susceptible of actual knowledge. *Ibid.*

sidered those representations material and that EMC needed to replace its Prime computer system with a DEC system, while retaining its Madic software, within a relatively short period of time; (d) the uniVerse software did not at the time work as represented by VMark; (e) VMark knew (or should have known) when it made the unqualified representations to EMC regarding uniVerse's capabilities that the software still had defects and shortcomings which created doubt that it would function as successfully as had been represented, particularly with respect to (i) uniVerse's performance on DEC Ultrix systems, (ii) its ability to convert dynamic files, and (iii) its ability to support the alternate indices function; (f) VMark in good faith expected uniVerse eventually, when fine-tuned, to function as represented; (g) VMark did not disclose uniVerse's known problems to EMC so as to modify its unqualifiedly positive statements about uniVerse; (h) VMark feared that if EMC were told about uniVerse's current performance problems, EMC might not license the software; (i) as further inducement to EMC's entering into the license transaction and attempted corroboration of VMark's positive representations regarding uniVerse's capabilities, VMark promised that it would buy back from EMC the DEC hardware if uniVerse did not perform as represented; and (j) EMC reasonably relied on VMark's representations, promises, assurances, and product specifications regarding uniVerse, which were material influences on its decision to license the uniVerse software and purchase the DEC computer equipment.[10]

These specific findings by the judge satisfy EMC's burden in sustaining its claim of actionable misrepresentation by

---

[10]The judge expressly found that EMC performed reasonable investigations, prior to entering the license agreement, in an effort to determine the ability of uniVerse to function in conjunction with a DEC system as represented. The judge's holding that EMC failed to establish that the withholding by VMark of material information, disclosure of which might have dissuaded it from licensing the defective uniVerse product, is logically inconsistent with his finding that EMC reasonably relied on VMark's unqualified representations to the effect that uniVerse suffered no functional drawbacks and would satisfy EMC's time-constrained needs.

VMark.[11] EMC was accordingly entitled to all damages it had suffered as a proximate result of VMark's misleading representations, *Rice* v. *Price*, 340 Mass. 502, 510-511 (1960), including all "out of pocket" expenses incurred in connection with the transaction, so as to restore the status quo ante, as if the transaction had never occurred. *Zimmerman* v. *Kent*, 31 Mass. App. Ct. 72, 82 (1991). Under this standard, the judge correctly awarded EMC $316,901, representing the remaining value of the DEC computer equipment which it would not have purchased but for VMark's misleading representations regarding uniVerse, and which it was unable to sell in mitigation of its damages.

The judge should have applied the same measure of recovery with respect to the value of the lost time of EMC's employees in the failed conversion process. He found that EMC had reasonably committed these employee resources in July, 1990, in reliance upon VMark's assurances as to the ease of implementation of conversion and had discontinued that commitment only in December, 1990, when uniVerse's inability to perform as represented was acknowledged by VMark. Just as the DEC computer hardware had no value to EMC in the circumstances, the time of those EMC employees dedicated to the futile attempt to convert to the DEC

---

[11]VMark's contentions that any misrepresentations do not aid EMC because they either contradict or are identical to an express provision of the license agreement, or amount only to a breach of contract, are not only unsupported by citation to Massachusetts authorities, but are also contrary to long-standing Massachusetts law and policy. See *Bates* v. *Southgate*, 308 Mass. 170, 182 (1941); *Snyder* v. *Sperry & Hutchinson Co.*, 368 Mass. 433, 446 (1975); *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. 704, 712-714 (1990). VMark's reliance on the damage limitation and integration clauses of the agreement to bar EMC's recovery for misrepresentation is misplaced. The Massachusetts authority just cited, particularly *Bates*, establishes that a party may not escape liability for misrepresentation by resort to such provisions. See *Bates* v. *Southgate*, 308 Mass. at 179-180, 182, 183. See also *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. at 711 n.5; *Sheehy* v. *Lipton Indus., Inc.*, 24 Mass. App. Ct. 188, 193-194 (1987); *V.S.H. Realty, Inc.* v. *Texaco, Inc.*, 757 F.2d 411, 417-418 (1st Cir. 1985). In any event, it is the law of Massachusetts that even sophisticated businessmen must deal with each other honestly and may not induce contractual relations by material misrepresentations. *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. at 712-713.

system was wasted and had no value to EMC because of uni-Verse's ongoing inability to function as promised. Damages for misrepresentation should have included the costs of the hours fruitlessly spent by EMC employees trying to make the defective computer system work. See, e.g., *Convoy Co.* v. *Sperry Rand Corp.*, 672 F.2d 781, 785 (9th Cir. 1982); *Clements Auto Co.* v. *Service Bureau Corp.*, 298 F. Supp. 115, 134 (D. Minn. 1969), affd. in relevant part, 444 F.2d 169 (8th Cir. 1971); *Stahl Mgmt. Corp.* v. *Conceptions Unlimited*, 554 F. Supp. 890, 895 (S.D.N.Y. 1983). EMC's evidence that it incurred costs of $65,208 for employees diverted to the unsuccessful conversion effort and that the time spent by such employees produced no benefit to EMC was undisputed and should have been accepted as the basis for the additional award.

2. *Chapter 93A.* As noted, the judge viewed VMark's representations to EMC about uniVerse as insufficiently rascally to be deemed unfair or deceptive as between parties experienced in the computer industry and sophisticated in business matters, under the "raised eyebrow" test of *Levings* v. *Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979). Possibly because of his truncation of EMC's misrepresentation count, the judge appears to have overlooked the additional teachings of *Levings*. To be held unfair or deceptive under c. 93A, practices involving even worldly-wise business people do not have to attain the antiheroic proportions of immoral, unethical, oppressive, or unscrupulous conduct, but need only be within any recognized or established common law or statutory concept of unfairness. *Id.* at 502, 504. More pertinently, *Levings* recognized that "[a] misrepresentation in the common law sense would . . . be the basis for a c. 93A claim." *Id.* at 504. Subsequent Massachusetts decisions have confirmed the validity of that observation. See *Datacomm Interface, Inc.* v. *Computerworld, Inc.*, 396 Mass. 760, 779-780 (1986); *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. 704, 714 (1990); *Glickman* v. *Brown*, 21 Mass. App. Ct. 229, 235 (1985); *Sheehy* v. *Lipton Indus., Inc.*, 24 Mass. App. Ct. 188, 194-195 (1987).

The damages that EMC claims were the result of VMark's unfair and deceptive acts are the cost of the DEC equipment and lost employee time devoted to the conversion effort — precisely the same damages as those proximately flowing from the tortious misrepresentations. Since cumulative recovery is not available in such a situation, see *McGrath* v. *Mishara*, 386 Mass. 74, 84-85 (1982); *Calimlim* v. *Foreign Car Center, Inc.*, 392 Mass. 228, 235-236 (1984),[12] there would be no independent legal significance to EMC's separate c. 93A count, but for EMC's demand that its damages be multiplied. EMC relies on the provision of G. L. c. 93A, § 11, par. 5, that authorizes doubling or trebling of actual damages for a "knowing" 93A violation, and on the scienter requirement for the tort of misrepresentation (see note 9, *supra*). The existence of that element, EMC asserts, automatically triggers § 11's mandatory doubling of damages for a "knowing" violation of the statute's prohibition against deceptive acts and practices.[13] We disagree. Although VMark's misstatements were made with sufficient awareness of the facts regarding uniVerse's less-than-perfect capabilities to be actionable under the traditional tort formula, they were not made so "knowingly" as to warrant the punitive sanctions of double damages under c. 93A.

---

[12]For the same reason, we need not separately address EMC's arguments that VMark's conduct gives rise to independent c. 93A liability for material nondisclosure. We recognize, of course, that EMC is in any event entitled, under G. L. c. 93A, § 11, par. 6, to an award of reasonable attorneys' fees and costs incurred in the action, in addition to the amount of its actual damages.

[13]General Laws c. 93A, § 11, par. 5, inserted by St. 1972, c. 614, § 2, states: "If the court finds for the petitioner, recovery shall be in the amount of actual damages; or up to three, but not less than two, times such amount if the court finds that the use or employment of the method of competition or the act or practice was a willful or knowing violation of said section two." The fact that the trial judge does not make an express finding that a defendant's violation of G. L. c. 93A, § 2, was either wilful or knowing is irrelevant if the evidence warrants such a finding. *Service Publications, Inc.* v. *Goverman*, 396 Mass. 567, 578 n.13 (1986); *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 475 (1991).

Central to our conclusions are the special circumstances involved in this case.[14] Most important are the judge's findings that VMark acted in good faith in its dealings with EMC, that it fully expected that uniVerse would function as represented, and that it was persistently ready and willing, though ultimately unable, to correct the software's shortcomings.[15] As a seasoned user of computer systems — so the judge found — EMC had to have realized that such complex, customized technology typically requires a period of adjustment and "debugging" after delivery to perfect. Cf. *Carl Beasley Ford, Inc.* v. *Burroughs Corp.*, 361 F. Supp. 325, 330 (E.D. Pa. 1973), affd., 493 F.2d 1400 (3d Cir. 1974); *Pezzillo* v. *General Tel. & Electronics Info. Sys., Inc.*, 414 F. Supp. 1257, 1259-1260 (M.D. Tenn. 1976), affd., 572 F.2d 1189 (6th Cir. 1978); *Logan Equip. Corp.* v. *Simon Aerials, Inc.*, 736 F. Supp. 1188, 1204 (D. Mass. 1990).

VMark's earnest efforts to make good on its contractual obligation by overcoming its product's recognized problems and making it perform to expectations do not, of course, create a defense to the tort claim. Establishing liability for misrepresentation does not require a showing that the defendant even knew that the statements made were false, see note 9, *supra*, let alone that the defendant actually intended to deceive the plaintiff. See *Zimmerman* v. *Kent*, 31 Mass. App. Ct. at 77, 81-82; Restatement (Second) of Torts § 526 comment (e); Prosser & Keeton, The Law of Torts § 107 (5th

---

[14]Whether particular conduct merits c. 93A condemnation always depends on the unique facts of each case. See *Spence* v. *Boston Edison Co.*, 390 Mass. 604, 615 (1983).

[15]Contrast the defendants' attitudes in two of the cases principally relied on by EMC, *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 472, 474-476 (1991), where the trial judge held that the defendant had deliberately violated its covenant of good faith and fair dealing; and *Dreier Co.* v. *Unitronix Corp.*, 218 N.J. Super. 260 (1986), where the seller of a software system, falsely represented as able to satisfy the buyer's needs, did nothing to attempt to fix the system after problems developed. We put great stock in the findings of the trial judge on issues such as intent and motivation, since he was in a superior position to assess the weight and credibility of the witnesses, and there is no showing that his findings were clearly erroneous. See *Zimmerman* v. *Kent*, 31 Mass. App. Ct. at 74 n.5.

ed. 1984).[16] The inept blend of hopeful dissembling and dogged bumbling displayed by VMark does not, however, reflect the "culpable state of mind" required for imposition of § 11's extraordinary damage penalty. Cf. *Shaw* v. *Rodman Ford Truck Center, Inc.*, 19 Mass. App. Ct. 709, 712 (1985), quoting from *Computer Sys. Engr., Inc.* v. *Qantel Corp.*, 571 F. Supp. 1365, 1375 (D. Mass. 1983), affd., 740 F.2d 59 (1st Cir. 1984).

We do not read the c. 93A cases as mandating that the multiple damages bonus be automatically imposed for any and all forms of misrepresentation. Rather, it is only when the acts of misrepresentation amount to "intentional fraud" that the severe sanction is appropriate. See *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. at 714. See also *Datacomm Interface, Inc.* v. *Computerworld, Inc.*, 396 Mass. at 779-780. The Supreme Judicial Court has recognized that only "callous and intentional violations" of c. 93A merit multiple damages, *Heller* v. *Silverbranch Constr. Corp.*, 376 Mass. 621, 627 (1978), and has emphasized the need to place a limit on punitive liability under c. 93A for "relatively innocent violations." *International Fid. Ins. Co.* v. *Wilson*, 387 Mass. 841, 854 (1983). As we have previously observed, a c. 93A offense may even be "grievous" without being knowing or wilful. *Shawmut Community Bank, N.A.* v. *Zagami*, 30 Mass. App. Ct. 371, 376 (1991), *S.C.*, 411 Mass. 807 (1992).

Delivery of a defective product without revealing the defects, to the extent they are known and material, is surely market disruptive to the same extent whether the promisor is genuinely hopeful of eventually fulfilling his contract, cf. *Logan Equip. Corp.* v. *Simon Aerials, Inc.*, 736 F. Supp. at 1204, or is deliberately deceptive and entirely disdainful of his commitments. Cf. *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. at 708-709, 711; *Anthony's Pier Four, Inc.* v.

---

[16]"The fact that the defendant was disinterested, that he had the best of motives, and that he thought he was doing the plaintiff a kindness, will not absolve him from liability" for misrepresentation if all the requisite elements are present. Prosser & Keeton, The Law of Torts, *supra* at 741.

*HBC Assocs.*, 411 Mass. 451, 474-476 (1991). Nonetheless, the fault of the former — which smacks more (the trial judge's off-hand conclusion notwithstanding) of gross negligence[17] than of intentional fraud, see *Glickman* v. *Brown*, 21 Mass. App. Ct. at 234-235 — is markedly less damnable than that of the latter. It is insufficiently egregious to bring the offending party within the statutory objective of punishing truly inequitable marketplace behavior, *Manning* v. *Zuckerman*, 388 Mass. 8, 12 (1983), which unmistakably reeks of callousness, *Heller* v. *Silverbranch Constr. Corp.*, 376 Mass. at 627, of bad faith, *Patry* v. *Liberty Mobilhome Sales, Inc.*, 15 Mass. App. Ct. 701, 706 (1983), and of meretriciousness, *Bachman* v. *Parkin*, 19 Mass. App. Ct. 908, 910 (1984). Cf. *International Fid. Ins. Co.* v. *Wilson*, 387 Mass. at 855, 856-857 ("The Massachusetts Legislature consciously enacted a rule whereby the defendant's [c. 93A] liability is measured by the degree of his culpability"); *Computer Sys. Engr., Inc.* v. *Qantel Corp.*, 571 F. Supp. at 1375-1376.

Accordingly, we hold that EMC did not make out a case for multiple damages on these facts. VMark was misguidedly insincere but fundamentally well-intentioned in its inducement of EMC to purchase software of dubious reliability for the intended purpose, in misplaced reliance on its ability to perfect a product whose defects were either insolubly inherent or of such intractability as to confound VMark's inadequate curative efforts. Such undesirable, but not reprehensible, conduct can be sufficiently deterred by the mandatory imposition on VMark of the significant c. 93A penalty of paying EMC's reasonable attorneys' fees and costs, as well as its actual damages.

---

[17]EMC made a separate claim and argument that VMark's inaccurate and incomplete representations regarding uniVerse were at the very least negligent. Although the tort of negligent misrepresentation is recognized in Massachusetts, *Glickman* v. *Brown*, 21 Mass. App. Ct. at 234-235, EMC has failed to develop this theory in any coherent manner, and the record does not provide a basis for determining the scope of the requisite duty of care in ascertaining and communicating the truth in circumstances such as those here presented.

As previously noted, it is unnecessary to address the merits of VMark's appellate challenges to the judge's award of reliance damages to EMC on the ground of either breach of contract or promissory estoppel. Even if the judge was wrong, EMC would remain entitled to recover the same damages under its successful misrepresentation count — its actual losses causally arising from VMark's conduct. See note 2, *supra.* Were the judge correct, EMC could not recover duplicative or cumulative damages under multiple legal theories based on the same core of fact. See *McGrath* v. *Mishara,* 386 Mass. at 83-84. *Calimlim* v. *Foreign Car Center, Inc.,* 392 Mass. at 235-236.

Accordingly, the judgment dated September 28, 1992, is to be modified by striking the second and third paragraphs and inserting the following:

"That judgment enter for the defendant EMC Corporation on counts IV and VI of its counterclaim against VMark Software, Inc., in the total amount of $382,109 plus interest.

"That judgment enter for the plaintiff VMark Software, Inc., on counts I, II, III & V of EMC's counterclaim."

As modified, the judgment is affirmed. The case is remanded to the Superior Court for the determination of EMC's reasonable attorneys' fees and costs under G. L. c. 93A, § 11.

*So ordered.*