Fabricant, Judith, J.
INTRODUCTION
This action arises from a dispute regarding a grant of stock options under an employment agreement between the plaintiff Mark Alford (“Alford”) and the defendant Superspeed Software, Inc. (“Superspeed”). Alford contends that Superspeed has breached the agreement by refusing to issue stock to him after his termination; he seeks money damages in an amount based on a proportionate share of what he alleges to have been the value of the company at that time. Superspeed concedes that Alford was entitled to stock, but denies that he is entitled to money damages. Before the Court is Alford’s motion for summary judgment. For the reasons that will be explained, summary judgment will enter for Alford on liability only.
BACKGROUND
The summary judgment record establishes the following facts as undisputed. On or about May 18,2001, Alford executed an employment agreement (“the Agreement”) with Superspeed.[1] Under the Agreement, Alford became the Executive Vice President “responsible for the sales and marketing initiatives at Super-speed.” The Agreement provided that Alford would receive no salary, but would be compensated through sales commissions and stock options that would vest on a specified schedule.[2] The options, the Agreement provided, “will be owned by you, and are not subject *404 to repurchase by the company.” The Agreement said nothing about a company stock option plan or about any restrictions on sales of the stock.
Two months before Alford began his employment, Superspeed had raised capital by selling convertible promissory notes based on a total valuation of the company at $50 million. Its board believed at the time that that amount was a fair valuation of the company. During the negotiations preceding Alford’s employment, Company executives told him that the company had raised capital based on that valuation.
The Agreement provided that if Alford separated from Superspeed by any means, he would be entitled to all options that had vested as of the date of separation. Alford did leave the company, voluntarily, on August 29, 2001, some three and a half months after his employment started.. According to the vesting schedule in the agreement, options for three quarters of one percent of the “current outstanding shares of stock in Superspeed” had vested by that date. Based on a total company value of $50 million, that percentage of ownership would have a value of $375,000.
Following his departure from Superspeed, Alford attempted to exercise his stock options. In an e-mail dated October 2, 2001, Alford requested that the company issue him “a stock certificate indicating .75% of ownership,” and that it deduct the option price from expense reimbursements due him. In response, Su-perspeed sent Alford, for his signature and return, a stock purchase agreement and a general release. By signing the stock purchase agreement, Alford would acknowledge that the stock was not registered under the Securities Act of 1933 and could not be offered to the public; that he had received and agreed to be bound by the company’s stock incentive plan; that the shares “are being acquired for investment and not with a view to the sale and distribution thereof’; that “no public market for the shares now exists and it is uncertain whether a public market will ever exist for the shares”; and that he would comply with certain legal requirements in case of sale of the shares pursuant to a specified exemption under federal law. The stock purchase agreement also included an indemnification provision, under which Alford would indemnify the company from any loss resulting from his failure to pay any tax obligations. The general release would waive any and all claims Alford may have had against the company.
Alford did not sign and return the documents, and instead asserted his intention to sue. Shortly thereafter an attorney on his behalf sent the company a letter, dated November 19, 2001, asserting that the company had violated G.L.c. 93A by failing to issue the stock to Alford, as well as by withholding certain claimed expense reimbursements. The letter demanded that the company tender the stock in return for payment of the option price. It also offered that “fi]n lieu of these shares of stock, Mark Alford would accept $300,000 in payment.”
The record before the Court is silent as to any interaction between the company and Alford from that letter until February 3, 2006.[3] By letter of that date, an attorney for Alford again asserted “our view that my client is entitled to purchase 3/4 of 1% of the outstanding shares of stock of the company in the form of an option.” No response from the company appears in the record. Aletter from another attorney for Alford, dated June 8, 2006, reiterated his demand for the stock, asserting that Alford had never been informed of or agreed to any stock option plan or stock purchase agreement, and that therefore his options were not subject to the provisions of either or to any restrictions.
The record also includes copies of stock purchase agreements and stock restriction agreements signed by other company personnel who exercised options, along with copies of IRS reporting forms reflecting issuance of stock to those personnel, and a copy of the company’s 2001 stock plan. The stock purchase and restriction agreements include the same acknowledgments set forth in the agreement that Alford refused to sign. The stock plan sets forth the conditions under which the company issues options to employees, including tax withholding, the requirement that the option holder submit a signed notice of exercise, and, generally, the authority of the board to impose various conditions on the issuance of any stock.
Alford filed this action on July 6, 2006. His complaint sets forth four counts. Count I seeks a declaratory judgment that he is entitled to receive the options, and that they are not subject to any stock option plan or any restrictions on sale or transfer. Counts II and III, respectively, claim breach of contract and breach of the implied covenant of good faith and fair dealing. Count IV seeks specific performance of the option provisions of the employment agreement. The company responded, on August 15, 2006, by filing an answer and three-count counterclaim. The counterclaim alleges that Alford failed to carry out the duties of his employment, “failed to dedicate his time, effort and resources to Superspeed, and induced the employment agreement by misrepresenting his qualifications. Based on these allegations, the counterclaim asserts counts of breach of contract, breach of the implied covenant of good faith and fair dealing, and misrepresentation by Alford.
In his summary judgment motion, Alford asserts that he is entitled to elect his remedy, and that he elects to receive money damages, which he claims are in the amount of $375,000, based on the $50 million valuation as of the start of his employment. He further contends that he is entitled to interest on that amount, at the judgment rate, from October 1, 2001, when he first informed the company of his intent to exercise his options. The company agrees that the matter should *405 be resolved on summary judgment, and implicitly agrees that it has breached the contract, but contends that Alford should receive only what he was promised — stock options — and that the monetary value of such options would be far less than the money damages he now claims.[4]
DISCUSSION
The record establishes as undisputed that the company responded to Alford’s effort to exercise his options by demanding that he sign the stock purchase agreement and release; when he refused, the company did not issue the stock to him. As the Court will address further infra, the company may have had the right to condition issuance of stock to Alford on his execution of standard documents required by its stock option plan, such as the stock purchase agreement. Nothing, however, would give it the right to condition issuance of the stock on his execution of a release. It follows that the company has breached its express obligations under the contract.[5]
The question is what remedy is appropriate. Alford contends that he is entitled to elect his remedy, and he chooses monetary damages. See Dalton v. American Ammonia Co., 236 Mass. 105, 107 (1920). If monetary damages are to be awarded to Alford, they must be in an amount calculated to “put him in as good position financially as he would have been in if there had been no breach . . Pierce v. Clark, 66 Mass.App.Ct. 912, 914 (2006), quoting Boylston Hous. Corp. v. O’Toole, 321 Mass. 538, 562 (1947). See also VMark Software, Inc. v.EMC Corp., 37 Mass.App.Ct. 610, 611 n.2 (1994) (“the wronged party should receive the benefit of his bargain, i.e., be placed in the same position as if the contract had been performed”).
If the agreement had been performed, Alford would have received unregistered stock, amounting to a .75% share, in a private corporation. Entirely aside from any restrictions under any stock purchase agreement or company stock option plan, he would have been prohibited by law from offering his stock for sale to the public. See 15 U.S.C. §77e(a)-(c); G.L.c. 110A, §301. He might, or might not, have been able to arrange a private sale to another shareholder, or to the company, at some price that would have been negotiated, but he would have had no contractual right to compel the company or anyone else to purchase the stock from him, and no guarantee — indeed probably no likelihood — of receiving a price proportional to the value of the company, or any other particular price.[6]
An appropriate award of damages for the company’s breach would thus be in an amount reflecting the market value of stock that had no market. It appears that the stock would have been worth something, since the company had value, and one could fairly infer that the stock would have represented an opportunity for long-term growth. But nothing before the Court provides a basis for setting the value of the stock. It is clear, however, that its value, and thus the proper amount of damages to be awarded, would have been far less than the $375,000 Alford claims. Alford is entitled to prove his damages if he seeks a damage remedy, but the burden of proof is on him. The present motion falls short of establishing the absence of a genuine dispute of material fact on the point.[7]
Should Alford choose specific performance, instead of damages, he would be entitled to an order that the company issue stock to him equal to a .75% share in the company, upon payment of the option price. The difficult question is whether the stock would be subject to the various restrictions and conditions set forth in the company’s stock option plan and in the stock purchase agreement.[8] The company contends that it should, because all other company personnel who have received stock options are subject to those documents, and Alford should receive no different treatment.[9] Alford contends not, because his employment agreement made no mention of those documents or of any such conditions.
The record does not provide an adequate basis for the Court to resolve this question. Put differently, Alford has failed to establish the absence of a genuine dispute of material fact on the point. McLaughlin v. Town of Marblehead, 68 Mass.App.Ct. 490, 495 (2007), citing Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). The Agreement is an informal document, setting forth material terms, but without an integration clause, or other standard contract language. Nothing before the Court identifies any oral communications that may have occurred between the parties on the subject, nor does anything indicate any awareness that Alford may or may not have heard of the company’s standard policies and practices in this regard, or of general norms in the industry with respect to the issuance of stock options. It may, or may not, have been implicit in the agreement that the issuance of options to Alford would occur in the same manner, and subject to the same terms, as the issuance of stock to other company personnel; the Court simply cannot determine that from the record presented. The Court therefore concludes that summary judgment is warranted as to liability, but the determination of a remedy will require further proceedings.
CONCLUSION AND ORDER
For the reasons stated, the plaintiffs Motion for Summary Judgment is ALLOWED with respect to liability on count II of the complaint, alleging breach of contract. In all other respects, the motion is denied. Counsel are directed to confer with respect to the nature and timing of further proceedings, including any proceedings that will be necessary to resolve the counterclaims, and to contact the clerk to schedule a status conference at the earliest available date.

The agreement was in the form of a letter or memorandum to Alford from the company’s Chief Executive Officer, countersigned by Alford.

he agreement also provided for medical, dental, and disability insurance and a car allowance.

Apparently, although the record is less than clear on the point, Alford’s renewed interest was triggered by his learning that Superspeed had obtained a substantial settlement of litigation against Oracle Corporation.

rhe defendant’s response to the summary judgment motion does not contend that any conduct of Alford as alleged in the counterclaim provides a defense to Alford’s claims. Neither side has moved for summary judgment on the counterclaims.

Whether it has also breached the implied covenant of good faith and fair dealing is a moot point, since no harm other than that arising from the breach of express obligations is alleged.

He would also have been subject to whatever tax consequences the law would have imposed on his receipt of the stock, and Superspeed would have been required to comply with any statutory or regulatory obligations of reporting to tax authorities.

The matter of interest is governed by statute. Upon proof of damages, Alford would be entitled to an award in the appropriate amount, with interest to run from the date of the breach, which would appear to be within a reasonable time after his first demand to exercise the options, on October 2, 2001. See G.L.c. 231, §6(c).

As noted supra, some, indeed perhaps most, of those provisions simply acknowledge restrictions that would apply regardless of any contract or company policy.

Superspeed asserts in its memorandum that “all of the current shareholders are subject to transfer restrictions,” but provides no evidence to support that assertion. No affidavit indicates whether the signers of the documents submitted are all the current shareholders.