Kern, Leila R., J.
The plaintiff, PerfectYourself.com, Inc., brought this action to recover damages arising out of AccuSoft Corporation’s failure to develop and deliver an adequate imaging software application in accordance with contract specifications. After a ten-day trial, the jury found AccuSoft liable for breach of contract and fraudulent misrepresentation, and awarded damages in the amount of $100,000.00 and $310,000.00, respectively, on each claim. The jury also returned a verdict in PerfectYourselfs favor on AccuSoft’s counterclaim for breach of contract. This court reserved PerfectYourselfs G.L.c. 93A claim for itself, and now makes its findings of fact and rulings of law on this claim.
Findings of Fact
Based on the weight of the credible evidence and reasonable inferences drawn therefrom, this court finds the following facts.
PerfectYourself is a Delaware corporation which is headquartered in New York, New York. At all times pertinent hereto, the defendant, AccuSoft Corpora *30 tion, was headquartered in Westborough, and later in Northborough, Massachusetts.
At all relevant times, the Chief Executive Officer of PerfectYourself was Joseph Mackin. Mackin co-founded PerfectYourself with Howard Beilin. Beilin, a plastic surgeon, is the company’s chief investor. Beilin had been in the plastic surgery field for thirty years as of 2001. The Chief Technical Officer of PerfectYourself was Jeffrey Hildebrandt. Hildebrandt has substantial experience in custom software development.
Around the summer of 1999, Mackin met with Beilin to discuss starting a business that would allow people to use the internet to undertake “personal transformation,” a process that would permit the user to see how he or she would look after application of cosmetics or the performance of plastic surgery. Their goal was to create a user-friendly, internet-based version of software applications being used at the time in plastic surgeons’ offices.
Mackin and Hildebrandt investigated possible software developers that would dovetail with PerfectYourselfs business concept. During a visit at a company called Canfield Technologies in New Jersey, they were able to look at a software package known as Mirror Image, in which was embedded ImageGear — an image processing software package developed by AccuSoft. As a result, Mackin contacted AccuSoft and was put into contact with William Hockstedler, a sales consultant with the company. Hockstedler arranged for a meeting at AccuSoft’s offices.
In the autumn of 1999, representatives from PerfectYourself and AccuSoft met on two occasions to discuss the software development project. Mackin attended both of these meetings, as did AccuSoft’s Chief Executive Officer, Scott Warner. Mackin described the image manipulation program PerfectY-ourself sought. Warner assured Mackin that AccuSoft would be able to design such a program, and represented that AccuSoft had most of the requisite technology to develop the software available in its current “library” of algorithms. Warner claimed that AccuSoft’s existing algorithms would allow user-friendly calibration (i.e., “mapping”) of images with just a few clicks of the mouse and that changes to the images would appear realistic. Drawing a face on a whiteboard to illustrate, Warner explained that by clicking on the right eye, the program would recognize that the left eye is to the left, the hair is above, and the chin below, and that the entire eye region would likely be detected by a single click on each pupil. Warner further represented that AccuSoft’s existing technology would “take the work out of the user experience.”
As a result of these meetings, the parties executed a contract in December 1999 titled “Professional Consulting Services Agreement,” under which AccuSoft agreed to develop written technical specifications for the image manipulation software application in exchange for PerfectYourselfs payment of $25,000.00. (Trial Ex. 6, at 1, 7-9.) On or around February 18, 2000, AccuSoft delivered to PerfectYourself a document titled ‘Technical Specification for Web Image Manipulation Application.” (Trial Ex. 7.) The document set forth a macro-level vision for the software PerfectYourself desired to have developed. (Trial Ex. 7.) The document recited that the “overall objective” was “to create and develop an attractive, user friendly, and powerful website” that, among other things, would be “easy to use.” (Trial Ex. 7, at 3.) The Technical Specifications described a system containing databases for the storage of both user images and objects. (Trial Ex. 7, at 22-28.) Image calibration would be performed by creating a series of “hotspots.” (Trial Ex. 7, at 11.) Once the user accomplished the initial calibration of his or her image, objects (e.g., glasses) could then be attached to the image from an “object library.” (Trial Ex. 7, at 12-13.) The target date for release of a beta version[1] of the software was five to six months following PerfectYourselfs approval for AccuSoft to commence the custom development work. (Trial Ex. 7, at 30.) Representatives from AccuSoft again represented to PerfectY-ourself that they were confident they could produce the software application.
On June 11, 2000, PerfectYourself executed an addendum to the Professional Consulting Services Agreement, under which the parties formally contracted for the custom development work. (Trial Ex. 8.) Warner and Hockstedler assured Mackin that AccuS-oft had done research and they were confident Accu-Soft would be able to create the software PerfectYourself desired. The contract stipulated the payment terms as follows:
(1) $100,000.00 due upon execution of the contract;
(2) $95,000.00 due upon the completion of a graphical user interface[2] (“GUI”) prototype;
(3) $40,000.00 due upon the completion of a “select feature and demo”;
(4) $15,000.00 due upon the completion of a beta version of the software; and,
(5) $60,000.00 due upon the final release and PerfectYourselfs acceptance. (Trial Ex. 8.)
Over the course of the software’s development, AccuSoft completed a number of progress reports and various revisions were made to the software’s “Functional Specifications.” (Exs. 10, 11, 59, 60.) Mackin expressed his satisfaction with the specifications, although he wanted the calibration to be easier to perform. (Trial Ex. 15.) In August 2000, AccuSoft delivered the GUI prototype to Mackin. (Trial Ex. 13.) Mackin was dissatisfied with the prototype, but nevertheless paid the $95,000.00 due under the contract. Additional revisions were made to the Functional Specifications on September 18, 2000. (Trial Ex. 11.)
On three separate occasions during the autumn of 2000, Mackin went to the cosmetics manufacturer L’Oreal for purposes of demonstrating the software. *31 The executives who witnessed the demonstration found it, in Mackin’s description, “compelling.”
In November 2000, AccuSoft delivered the select feature prototype to PerfectYourself. (Exs. 22, 24.) Mackin was again disappointed with the product’s development, particularly with the software’s poor image calibration capabilities. Calibrating the image took hundreds of “clicks” by the user, rather than just a few simple clicks as Warner had promised. Mackin expressed his dissatisfaction to one of AccuSoft’s software engineers, Jaiprakash Mistiy, who acknowledged that the software did not function correctly.
Given the prototype’s failures, Mackin objected to paying the $40,000.00 due under the contract. In a telephone call to AccuSoft’s representative, Colleen Rolph, Mackin noted his objection to making payment because of the numerous and substantial deficiencies with the current state of the software application. Rolph told Mackin that AccuSoft’s accounting department insisted PerfectYourself make the $40,000.00 payment nonetheless.
Mackin paid half of the balance on December 18, 2000. (Trial Ex. 9.) The following day, he sent a letter to AccuSoft that detailed the problems with the prototype. (Trial Ex. 29.) On January 3, 2001, AccuSoft ceased further development of the software due to Mackin’s refusal to pay the remaining balance of $20,000.00. (Trial Ex. 30.) Later that same day, Mac-kin sent Warner an e-mail noting his discontent with the current state of the application. (Trial Ex. 31.) Mackin attached a copy of the prototype to the e-mail and requested Warner contact him after reviewing it. (Trial Ex. 31.) Warner did not respond to this e-mail. On January 8, 2001, AccuSoft sent Mackin an e-mail stating that the company “stands firm” on its decision to suspend further development work until it receives payment from PerfectYourself. (Trial Ex. 32.)
On January 23, 2001, Mackin met with several representatives from AccuSoft to discuss their disagreements. This meeting was the first in a series of discussions toward a revision of the specifications for the project. At that meeting, AccuSoft’s Vice President of Sales, Peter Weinrobe, admitted that AccuSoft had under-budgeted the project, but assured Mackin that AccuSoft would be able to deliver the program as promised. Mackin paid the balance then due at the time of the meeting. Subsequent to this meeting, AccuSoft sent new “Requirement Specifications” to PerfectYourself, which adjusted how the image calibration and manipulation objectives would be achieved.[3] (Trial Ex. 34.)
On March 20, 2001, AccuSoft delivered an alpha[4] build of the software application to PerfectYourself. (Trial Ex. 53.) The alpha build lacked a number of functions anticipated by the parties, which AccuSoft assured would be included in the beta version of the software. Three days later, AccuSoft delivered a purported beta release of the software. (Trial Ex. 54.) PerfectYourself rejected the beta release due to its inadequate operability. Many of the product’s applications did not function properly and calibration could be performed only with great difficulty. As a whole, the calibration tools were incapable of effectively mapping the various features of the face and body. Mackin detailed the numerous deficiencies in the software’s performance in an e-mail to AccuSoft on April 4, 2001, and informed AccuSoft that PerfectYourself would not make the $15,000.00 payment until it received a completed beta. (Trial Ex. 40.) In response, AccuSoft claimed the beta was complete and demanded payment. (Trial Ex. 40.)
On April 20, 2001, AccuSoft delivered a so-called “final build” of the software to PerfectYourself. (Trial Ex. 42.) Many of the problems present in the beta build were left unresolved. (Trial Ex. 41.) Some applications conflicted with others, making numerous functions inoperable. Other functions simply did not work correctly. Use of some functions caused the internet browser to crash.[5] PerfectYourself considered the software unusable. On April 27, 2001, AccuSoft sent notice to PerfectYourself that it was terminating the Professional Consulting Services Agreement for failure to make the $15,000.00 payment. (Trial Ex. 72.)
As of the time of the trial, Warner knew AccuSoft did not have the requisite algorithms to do feature recognition when the original contract was executed.
Rulings of Law
General Laws c. 93A, §2, makes unlawful all “unfair or deceptive acts or practices in the conduct of any trade or commerce.” “(C)onduct is deceptive if it possesses ‘a tendency to deceive.’” Aspinall v. Philip Morris Cos., 442 Mass. 381, 394 (2004), quoting Leardi v. Brown, 394 Mass. 151, 156 (1985). Stated differently, a deceptive practice is one that “could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted.” Aspinall 442 Mass. at 394, quoting Purity Supreme, Inc. v. Attorney Gen., 380 Mass. 762, 777 (1980).
“A misrepresentation in the common law sense [may provide] the basis for a c. 93A claim.” Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 504 (1979). To recover, the plaintiff need not prove that the defendant intended to deceive the plaintiff, Aspinall 442 Mass. at 394, or that the defendant knew the representation was false, Slaney v. Westwood Auto, Inc., 366 Mass. 688, 703 (1975). A “negligent misrepresentation of fact the truth of which is reasonably capable of ascertainment is an unfair and deceptive act or practice within the meaning of c. 93A, §2(a).” Golber v. BayBank Valley Trust Co., 46 Mass.App.Ct. 256, 261 (1999), quoting Glickman v. Brown, 21 Mass.App.Ct. 229, 235 (1985); see also Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 62 (2004) (“[A] negligent misrepresentation may be so extreme or egregious as to constitute a violation of G.L.c. 93A, §11”). Thus, our appellate courts have found defendants liable under G.L.c. 93A, §§9 & 11, for misrepresenting the condition or effectiveness of the products they have sold. See, e.g., *32 Briggs v. CarolCars, Inc., 407 Mass. 391, 396-97 (1990) (condition of used automobile); VMark Software, Inc. v. EMC Corp., 37 Mass.App.Ct. 610, 620-25 (1994) (effectiveness of computer software); Glickman v. Brown, 21 Mass.App.Ct. 229, 234-35 (1985), abrogated on other grounds by Cigal v. Leader Dev. Corp., 408 Mass. 212, 216 n.8 (1990) (condition of heating system in condominiums); Lynn v. Nashawaty, 12 Mass.App.Ct. 310, 312 (1981), abrogated on other grounds by Knapp Shoes, Inc. v. Sylvania Shoes Mfg. Corp., 418 Mass. 737, 743 (1994) (value of business inventory).
In the present case, AccuSoft misrepresented the extent of the company’s existing technologies and capabilities at the time of the pre-contract discussions with PerfectYourself. As a result of these misrepresentations, AccuSoft induced PerfectYourself to enter into a contract with AccuSoft and pay $260,000.00 toward the development of a program that AccuSoft was unable to deliver. AccuSoft could have reasonably investigated the extent of its proprietary software technologies prior to making these misrepresentations to PerfectYourself, but failed to do so. The egregiousness of AccuSoft’s misrepresentations is further illustrated by the company’s behavior over the course of the software’s development. At no point did AccuSoft disclose to PerfectYourself that it had misrepresented the capabilities of its existing technology or otherwise indicate it would have great difficulty in designing a program suitable for PerfectYourselfs intended use. Instead, AccuSoft continued to provide assurances that it would be able to develop the program the parties originally discussed and demanded Perfect-Yourself to continue making payments under the contract. This court finds AccuSoft’s conduct “deceitful” and therefore violative of G.L.c. 93A.
This court does not, however, find AccuSoft’s violation “willful or knowing” so as to justify a double or treble damages award. See G.L.c. 93A, §11. The “severe sanction” of multiple damages is appropriate only in cases where the misrepresentations amount to “intentional fraud.” VMark Software, Inc., 37 Mass.App.Ct. at 623. AccuSoft was undoubtedly eager to be hired to develop the image manipulation software for PerfectYourself, and certainly boasted about the company’s existing technology, but did not do so with the intent to defraud. Cf. id. at 624 (software developer’s “misguidedly insincere but fundamentally well-intentioned” inducement of plaintiff to purchase software with known performance problems found insufficient to justify multiple damages). Accordingly, PerfectYourselfs recoveiy is limited to its actual damages,[6] plus reasonable attorneys fees and costs, as provided in G.L.c. 93A, §11.
ORDER
For the foregoing reasons, it is hereby ORDERED that judgment enter for the plaintiff on its G.L.c. 93A claim, and plaintiff be awarded reasonable attorneys fees and costs in addition to the jury’s verdict.

 A “beta” release of a software program is one that contains all core functions of the program and is ready for the end-user to be able to use and then provide feedback to the developer. Trial Test, of Pl.’s Expert, Sergeiu Simmel.

 A “graphical user interface” is a “visual computer environment that represents programs, files, and options with graphical images, such as icons, menus, and dialog boxes, on the screen. The user can select and activate these options by pointing and clicking with a mouse or, often, with the keyboard. A particular item (such as a scroll bar) works the same way for the user in all applications, because the graphical user interface provides standard software routines to handle these elements and report the user’s actions (such as a mouse click on particular icon or at a particular location in text, or a key press); applications call these routines with specific parameters rather than attempting to reproduce them from scratch.” Microsoft Computer Dictionary 239 (5th ed. 2002).

 The Requirement Specifications amended the technical specifications set forth in the Functional Specifications dated September 18, 2000. The terms of the Functional Specifications thus remained in effect to the extent they did not conflict with the Requirement Specifications. Among other things, the Requirement Specifications explained and implemented use of a “morph tool,” identified a number of problematic areas in the software’s development that required further analysis, and adjusted calibration methods in an effort to achieve more effective results. This court rejects PerfectYourselfs contention that the Requirement Specifications document was an attempt by AccuSoft to “dumb-down” the technical specifications and thereby avoid its contractual obligations.

 A software “alpha” is one that is “under development and has enough functionality to begin testing. An alpha is usually unstable and does not have all the features or functionality that the released product is to have.” Microsoft Computer Dictionary 24 (5th ed. 2002).

 Mackin demonstrated in court how the program occasionally would cause the browser to crash, i.e., the program would freeze and the computer would need to be restarted before the user could continue.

 The jury’s award of $410,000.00 in damages on the breach of contract and fraudulent misrepresentation claims is adequate compensation for PerfectYourselfs actual damages on the G.L.c. 93A claim.