**ARTHUR D. LITTLE INTERNATIONAL, INC., et al., Plaintiffs,**

v.

**DOOYANG CORPORATION, et al., Defendants.**

Civ.A. No. 94–11875–PBS.

United States District Court, D. Massachusetts.

Sept. 19, 1997.

Peter J. MacDonald, Charles P. Kindregan, Hale & Dorr, Boston, MA, for Plaintiff.

Robert L. Weigel, Leslie E. Moore, Leonard Hersh, Gibson, Dunn & Crutcher, New York City, John A. Donovan, Jr., Mark J. Ventola, Burns & Levinson, Boston, MA, for Defendants.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER OF JUDGMENT

SARIS, District Judge.

This action is about an aluminum smelter that was never built in Venezuela. On October 25, 1996, after a month-long trial, a jury returned a verdict in favor of plaintiff Arthur D. Little, Inc. ("ADL"), a consulting firm, on its breach of contract claim based on non-payment of fees and awarded damages of $460,000.00. The jury rejected the counterclaims of defendant Dooyang Corporation ("Dooyang"), a Korean corporation which was hoping to build the smelter, for breach of contract, negligence, negligent misrepresentation, and fraud.

ADL now presses its claim for multiple damages, costs and attorneys fees pursuant to Mass. Gen. Laws ch. 93A. After hearing, the Court orders entry of judgment in favor of ADL on its Chapter 93A claim, and awards costs and attorneys fees. It further concludes that actual damages will be doubled under the statute.

### FINDINGS OF FACT

1. *The Competition to Build the Smelter*

ADL is a consulting firm located in Cambridge, Massachusetts. Dooyang is part of a Korean conglomerate engaged in various business enterprises around the world. Dooyang's chairman, D.Y. Kim, is a sophisticated businessman, educated in the United States. During 1989 and 1990, ADL performed consulting services for Dooyang in connection with a proposed aluminum smelter project in Venezuela. The smelter was never built, either by Dooyang or by any other foreign investors.

Frank Yans was ADL's consultant in Caracas. He was working for Dooyang in its efforts to build the "greenfield smelter"—meaning from the ground up—and to obtain a special subsidy awarded by the Venezuelan government to investors. Simultaneously, Yans and others at ADL were assisting an arm of the Venezuelan government, Corporacion Venezolana de Guayana ("CVG"), to attract investors to Venezuela and to evaluate the competing aluminum projects of investors, including ALCOA, ALUMAX, and Dooyang, all of which were striving to get the subsidy. Yans worked directly for the President of CVG, who had cabinet minister status in the Venezuelan national government, and used this connection to encourage Dooyang to take the risk of investing in Venezuela. At the inception of the contract, Yans fully disclosed this conflict of interest to Kim, who believed that Dooyang could benefit from ADL's inside access to the Venezuelan government. Yans' team worked closely with Chul S. (Alex) Song, President of Dooyang America, who was the Dooyang employee directly responsible for the Venezuelan smelter project.

On June 2, 1989, ADL and Dooyang entered into a six-month letter agreement, under which ADL agreed to provide consulting and lobbying services on a "best efforts basis" and to exercise its "best judgment" on behalf of Dooyang. The letter agreement was to be interpreted according to the laws of the Commonwealth of Massachusetts and other "general provisions." The letter agreement was extended an additional six months in a January 16, 1990 letter, and a third six-month extension was agreed to in a July 17, 1990 letter.

With ADL's assistance, Dooyang's project was proceeding apace. On January 18, 1990,

Dooyang and CVG entered into a Protocol agreement which stated the parties' intent to establish a smelter in Guayana, a section of Venezuela. Dooyang had formed a joint venture with EIE, a Japanese company, to develop the smelter. EIE's contribution was to secure a letter of credit to pay the money owed to ADL. The key to the success of the project was the acquisition of the government subsidy, known as a "debt-equity swap," from CVG.

Meanwhile in April 1990, as Dooyang was putting the pieces in place to become a serious investor in Venezuela, ADL was also advising CVG on how to attract investment in aluminum smelters and was actively representing CVG in negotiations with competing investors, such as ALCOA. Yans became concerned about whether there was enough loading/unloading capacity in the port for more than one smelter, and he advised CVG that in other respects CVG was not in a position to provide a complete infrastructure package as expected by the aluminum project investors. While instructing CVG on how to get the best deal with potential investors by shifting to them the responsibility for port construction, ADL encouraged Dooyang to provide the port itself to enhance its position as it competed for the government subsidy.

Also at this time, during the spring and summer of 1990, Yans wrote to CVG to compare the relative strengths and weaknesses of the three smelter projects. He advised CVG that the ALCOA project was the most important because it "has all needed elements 'in-house'(cash, technology, alumina, management)—and therefore great effort should be expended towards its realization." He also made positive, albeit less glowing, comments about Dooyang, which he described in July as "Best financed project. Very committed. On Fast Track." He rated Dooyang with a "B plus/A minus," and ALCOA was rated with a "D minus/A plus." Kim fully understood Yans' role in assisting CVG to select the projects that it would support with the government subsidies, although he did not know about Yans' upbeat presentation of the ALCOA project. Yans assured Kim that he had succeeded in convincing CVG that the Dooyang project was the "number one project to support." Nonetheless, during this time period and even as late as December 1990, Yans continued to contact Dooyang's competitors, ALCOA and ALUMAX, on CVG's behalf.

On December 14, 1990, with ADL's assistance, Dooyang submitted its proposal for the debt/equity swap for its smelter, called the "Orinoco Project." Throughout 1990, Dooyang was satisfied with ADL's services. Both ADL and Dooyang were cautiously optimistic that Dooyang would be successful in the competition to get a subsidy.

On December 21, 1990, Yans proposed an eight-month extension of the service contract, which was to expire on December 31, 1990. On January 15, 1991, Yoon, the President of Dooyang, wrote to Yans in his Cambridge office to discontinue ADL's services as a general project advisor. Rather, Yoon offered the following:

> We propose instead to retain you for specific assignments as this project continues. Alex Song and Dick Humphrey are the only individuals specifically authorized to retain you and direct your work. We invite you to call our attention to specific tasks which may need our attention.
>
> For each assignment, we will want a prior understanding of the scope of work and budget. We will want you to submit us itemized invoices on a monthly basis. We will pay you within 20 days of the receipt of each invoice. We agree to the general provisions stated on page 5 of your letter.

On January 24, 1991, after discussions with Kim and Song, Yans sent Yoon a revised proposal from his Cambridge office and asked Yoon to provide an "immediate answer as to the acceptability of the revised proposal."

### 2. *Failure to Build the Smelter.*

On March 2, 1991, the boom dropped when the Venezuelan government rejected Dooyang's application in favor of ALCOA. Dooyang's Vice President for Aluminum Investments, Richard L. Humphrey, urged Kim to pull out of the project as fruitless. Nevertheless, Kim called Yans for help, and Kim testified that he expected to pay ADL for any additional assistance. On March 5, 1991, Kim, Yoon, and Song of Dooyang met with Yans of ADL in Caracas to discuss resubmit-

ting Dooyang's application. They reached an oral agreement that ADL would continue to work for Dooyang, and Kim personally authorized the additional work. Later that month, Yans presented a written analysis of what had gone wrong with the original application, including a misunderstanding by CVG of Dooyang's financial strength.

In an April 20, 1991 letter from Yans in Cambridge, Massachusetts to Kim in Korea, ADL memorialized the verbal agreement that they had reached in Caracas. Yans agreed to undertake "additional tasks as requested by Dooyang Corporation," and to charge for "time actually expended and expenses incurred." He expressly stated that the invoices were "due and payable immediately upon receipt." Yans also submitted an invoice for services during the month of March, provided primarily in Caracas, and attached the "General Provisions" sheet that had been incorporated into the previous agreements. ADL requested that Dooyang establish a "letter of credit" to assure that its invoices would be paid, but Dooyang assured Yans that there were no regulatory obstacles to payment.

The Orinoco smelter proposal was resubmitted on April 26, 1991. ADL provided services for Dooyang as requested in March through May 1991. In June 1991, the Venezuelan government approved subsidies for both the Dooyang project and a third project. Kim again wrote Yans in Cambridge to thank him for his support on the project. Dooyang did not further extend its contract with ADL.

But the application's bare acceptance would unfortunately be the highlight of the Orinoco project. In September 1991, EIE pulled out of the project. Kim signed an agreement to buy EIE out by repaying it $2,216,500.00, the monies EIE had paid to ADL as its investment in the project. Then, Kaiser Aluminum, Dooyang's partner with the technological expertise, became unwilling to provide its share of the equity and withdrew from the project in March 1992, about a month after an attempted coup by the Venezuelan military. Dooyang pursued the project at least through September 1993, when the price of aluminum fell so much that the project became infeasible. The collapse in aluminum pricing was caused by a world economic recession and the demise of the Soviet Union, which flooded the world aluminum market with Soviet-produced aluminum. Dooyang had incurred costs of over $9 million in connection with the Orinoco project. None of the proposed smelter projects was ever built in Venezuela. Indeed, other than one project in South Africa, no construction of new aluminum smelters has been commenced anywhere in the world since.

### 3. *Failure to Pay the Invoices.*

ADL's final invoices of April 1991, May 1991 and June 1991, totalling $460,000, were never paid. About 80 percent of the work billed in those invoices took place in Caracas. Dooyang continually promised to pay ADL's invoices, although it had no intent to do so. S.K. Park, the general manager of Dooyang Corporation and the designee of Dooyang pursuant to Fed.R.Civ.P. 30(b)(6), testified that he thought that "ADL should work for Dooyang to get the second debt/equity swap licensing for free" and that on April 20, 1991 he decided that he should not pay the invoice upon receiving it. He explained:

> Well, of course when I received this invoice, I understood that they [ADL] were expecting the payment for their services; but to my business ethics, to my understanding of business ethics, because we always spend a lot of money, even for Australian project, and we also already spent money, great deal of money, for the first application process, and it failed, it [ADL's invoice] was not acceptable.

Essentially, having already paid $2.2 million for ADL's advice and its much touted insider influence, which failed to reap a government subsidy, Dooyang decided that ADL should provide the additional services for free. The problem is that no one from Dooyang informed ADL that it expected ADL to work for nothing, and it kept requesting services even after it had made the decision not to pay for them.

Dooyang followed a "check's in the mail" strategy to dodge payment. Song, for his part, believed ADL should be paid. When Song, at Dooyang America, pressured Dooyang in Korea to pay the balance in a fax dated September 1, 1991, S.K. Ko, the chairman of Dooyang Corporation, explained that he had problems paying the consulting agreement under a foreign exchange regula-

tion. Referring to Song's "ceaseless demand," Ko promised to have the invoices paid by October "at the least." Dooyang forwarded this fax to Yans in Cambridge.

On October 28, 1991, Ko sent a fax to Song and to Yans in Cambridge explaining that the Korea Exchange Bank had refused approval of the application to pay ADL, and proposed various alternatives to pay the bill connected, in part, with upcoming shareholders' meetings. That same date, Yans demanded immediate payment in a letter from Cambridge. In November 1991, at a meeting in Cambridge, representatives of Dooyang agreed to pay the outstanding invoices by January 1, 1992. When Dooyang missed that deadline, ADL complained. Dooyang responded, in a letter sent to ADL's Cambridge office on March 17, 1992, that it had "no intention to delay or discard the payment." It blamed the delay on the failure to obtain the necessary approvals from the Korean government and expressed its intent to pay the invoices as part of the Orinoco shareholders' initial funding at a shareholders' meeting to be held at the end of May 1992. If that should be postponed, it promised to pay in six monthly installments beginning in January 1993. When that deadline was missed, on March 11, 1993, Ko of Dooyang wrote to Cambridge again communicating its intent to pay by June 1993 on culmination of a shareholders' meeting. He blamed the delay on "legal compliance and auditing problems." No payment was forthcoming. This action was filed against Dooyang in Superior Court on August 11, 1994, and was removed here.

Other advisors on the project were no more successful in getting their bills paid. Baker & McKenzie, which provided legal advice, Citicorp, which provided financial advice, and SNC, which provided technical feasibility advice, had to sue Dooyang to recover unpaid fees.

In its 1992 Business Report, Dooyang itself summed up the strategy: "As noted earlier, [Dooyang] has been delaying accounts payable associated with Orinoco project *by all possible means.*" (Emphasis added). The Business Report set forth Dooyang's strategy of forcing compromises through litigation. On April 16, 1993, S.K. Park forwarded two faxes demanding payment from ADL to K.T. Kim, director of Dooyang America and wrote: "Mr. Yans is in the position where he has no choice but to demand payment persistently; we understand this, but Dooyang is in a position where payment is impossible. Problem. Keep this in mind and let's try to think of something."

At his deposition, Kim explained that Dooyang did not pay the invoices because Dooyang had relied on ADL's advice that the project was viable when it was not and that there were accounting problems with the invoices. However, Dooyang never raised these objections prior to litigation. Also, Kim never mentioned foreign exchange regulations as a reason for payment delay.

I find that Dooyang made intentional written misrepresentations to ADL concerning its intent to pay the three invoices in the writings dated September 1, 1991, October 28, 1991, March 17, 1992, and March 11, 1993, which were sent to Cambridge, Massachusetts, and in oral misrepresentations concerning its intent to pay during the face-to-face meeting in Cambridge Massachusetts in the fall of 1991. I further find that at least beginning on April 20, 1991, Dooyang did not intend to pay ADL for the invoices arising from the work on the second debt/equity application. Although Kim, who ran all aspects of the aluminum smelter, may have initially been willing to pay at the March 5, 1991 meeting, he quickly changed his mind and concurred in this approach espoused by Park, at least until the project turned out to be viable. I do not find his testimony credible that he did not learn the invoices had not been paid until 1992 or 1993.

Once the project began to flounder, and aluminum prices plunged, I find that Dooyang abandoned any intent to pay any consultants, including ADL, made false representations about intent to pay, never had any good faith basis for delaying payment, and intended to force ADL to litigate as leverage to force a favorable settlement. At least initially, in the answer to ADL's complaint for breach of contract, Dooyang asserted defenses in bad faith.[1]

---

1. I do not mean to impugn Dooyang's counsel or to suggest that counsel violated Fed.R.Civ.P. 11.

## CONCLUSIONS OF LAW

### 1. Deceptive Acts

ADL has easily proven that Dooyang engaged in unfair or deceptive acts or practices in violation of Mass. Gen. Laws ch. 93A, §§ 2, 11, in two ways.[2]

■ First, where one party orders consulting services without an intent to pay for them, such conduct constitutes a violation of the statute. *Levings v. Forbes & Wallace, Inc.,* 8 Mass.App.Ct. 498, 504, 396 N.E.2d 149 (1979). Here, Park's testimony was the smoking gun. Whatever Kim's initial intent at the March 5, 1991 meeting, by the time Park received the first invoice on April 20, 1991, Dooyang had decided not to pay the invoices for ADL's services at least until the project became viable, if at all. Yet it continued on a regular basis to request services from ADL. Dooyang had no good faith basis for its refusal to pay the invoices during 1991 to 1994.

■ Second, Dooyang engaged in deceptive conduct from 1991 to 1994 when it repeatedly expressed an intent to pay ADL when it had no intent to do so, and it used pretexts to explain the payment failure. This deceptive conduct prejudiced ADL because it delayed instituting litigation to collect a lawful debt. This bad faith behavior when ADL attempted to enforce the contract constitutes a breach of the duty of good faith and fair dealing in violation of Chapter 93A. *See Charles River Data Sys., Inc. v. Oracle Complex Sys. Corp.,* 788 F.Supp. 54, 61 (D.Mass.1991) (holding that post-contractual conduct is covered by Chapter 93A).

■ Dooyang also engaged in deceptive conduct when it followed a strategy of commercial extortion by failing to pay clear obligations to consultants, including ADL, to force favorable price concessions through the threat of expensive litigation. *See Pepsi–Cola Metro. Bottling Co. v. Checkers, Inc.,* 754 F.2d 10, 18 (1st Cir.1985) (proscribing commercial extortion); *Massachusetts Employers Ins. Exch. v. Propac–Mass, Inc.,* 420 Mass. 39, 43, 648 N.E.2d 435 (1995) ("While it is correct that breach of contract alone does not amount to an unfair act or practice under G.L. c. 93A, § 2 ..., conduct undertaken as leverage to destroy the rights of another party to the agreement while the agreement is still in effect ... has a coercive quality that, with the other facts, warranted a finding of unfair acts or practices."); *Anthony's Pier Four, Inc. v. HBC Assocs.,* 411 Mass. 451, 475, 583 N.E.2d 806 (1991) (party's "knowing use of a pretext to coerce" other side in breach of the duty of good faith and fair dealing violates 93A "as a matter of law").

The smoking gun here is the annual report in 1992 which sets forth Dooyang's sue-me litigation strategy for avoiding payment. This is not a situation where Dooyang believed in good faith that it had the right to set-off as the basis for a refusal to pay. *Quaker State Oil Ref. Corp. v. Garrity Oil Co., Inc.,* 884 F.2d 1510, 1514 (1st Cir.1989).

### 2. Substantially and Primarily.

■ In defense, Dooyang asserts that Chapter 93A does not apply because its alleged misconduct did not "occur primarily and substantially within Massachusetts." An unfair or deceptive practice between business people is not actionable under section 11 unless "the actions and transactions constituting the alleged unfair method of competition or the unfair act or practice occurred primarily and substantially within the com-

---

After automatic disclosure and discovery, Dooyang's counsel discovered evidence concerning ADL's role in promoting the ALCOA project, which formed the basis for a good faith defense that ADL breached the contract and did not disclose the full extent of the conflict of interest. However, I ultimately conclude that Kim and the other members of Dooyang's team in Caracas, like Song, fully understood the extent of the conflict and hoped to benefit from it.

**2.** Mass. Gen. Laws ch. 93A, § 2(a) (1997) reads: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Violations of § 2 are remedied through application of § 11, which reads in pertinent part: "Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two ... may bring an action...."

monwealth." Mass. Gen. Laws ch. 93A, § 11. Dooyang carries the burden of proving that its conduct primarily and substantially occurred outside of Massachusetts. *Roche v. Royal Bank of Canada,* 109 F.3d 820, 829 (1st Cir.1997).

■ To determine where the misconduct occurred, the court must engage in three principal inquiries: "(1) where defendant committed the deception; (2) where plaintiff was deceived and acted upon the deception; and (3) the situs of plaintiff's losses due to the deception." *Id.* With respect to the second inquiry, the location of the person to whom the deceptive statements are made is of special significance, as distinguished from the location of the person who uttered the deceptive statements, since "[t]he victim's ingestion of a deceptive statement and the subsequent effects from reliance on it are what give the deceptive statement its venomous sting." *Play Time, Inc. v. LDDS Metromedia Communications, Inc.,* 123 F.3d 23, 33 (1st Cir.1997) (quoting *Clinton Hosp. Ass'n v. Corson Group, Inc.,* 907 F.2d 1260, 1266 (1st Cir.1990)).

■ Dooyang has proven that the first act of deception—the request for consulting and lobbying services in April and May 1991 despite an intent not to pay—was committed primarily and substantially in Caracas. That is where Kim and Yans entered into the initial contract and where ADL acted on the deception by continuing to provide consulting and lobbying services. While Yoon's letter to Yans in Cambridge on January 15, 1991 was the genesis of the 1991 discussions, the agreement was not reached until March 1991 during the tete-a-tete between Kim and Yans in Caracas. Although the three invoices were sent from Cambridge, 80 percent of the work took place in Venezuela. ADL points out that losses due to the deception occurred in Massachusetts, but that is only one of the three *Roche* factors.

■ Dooyang has not, however, met its burden with respect to the second act of deception—the commercial extortion. The deceptive representations to forestall pay-

ment may have been made in letters and faxes originating outside Massachusetts, but they were sent to ADL's office in Cambridge. Indeed, there was a meeting in Cambridge in November 1991 in which deceptive representations concerning intent to pay were made. ADL was lulled by these false assurances into forestalling litigation in Massachusetts in the hope of eventual payment. Plaintiff's losses—both from the breach of contract and the litigation expenses and attorneys fees incurred in bad faith litigation—occurred here in Massachusetts. Accordingly, the first *Roche* factor weighs partly in ADL's favor, and the second two factors weigh strongly in ADL's direction. The Court determines, then, that Chapter 93A applies to this action.

### 3. *Damages*

In addition to its actual damages suffered by Dooyang's nonpayment, ADL has requested multiple damages under Chapter 93A on the grounds that Dooyang's misconduct was "willful and knowing."[3]

■ Multiple damages are not levied against all defendants who violate Chapter 93A, and the decision whether to award them is factually sensitive. *VMark Software, Inc. v. EMC Corp.,* 37 Mass.App.Ct. 610, 622 n. 14, 642 N.E.2d 587 (1994). "Those defendants who have 'relatively innocent violations' of the statute are not liable for multiple damages, while a second class of defendants who have committed 'willful or knowing' violations are." *Datacomm Interface, Inc. v. Computerworld, Inc.,* 396 Mass. 760, 779, 489 N.E.2d 185 (1986) (quoting *Int'l Fidelity Ins. Co. v. Wilson,* 387 Mass. 841, 853, 443 N.E.2d 1308 (1983)). A simple finding of intentional misrepresentation "does not automatically trigger punitive damages. There must be something more." *Cambridge Plating Co., Inc. v. Napco, Inc.,* 85 F.3d 752, 770 (1st Cir.1996); *see also VMark Software,* 37 Mass.App.Ct. at 621, 642 N.E.2d 587. The law of Chapter 93A, then, has developed the sometimes elusive paradigm that a misrepre-

**3.** The damages portion of ch. 93A, § 11 provides that: "If the court finds for the petitioner, recovery shall be in the amount of actual damages; or up to three, but not less than two, times such amount if the court finds that the use or employment of the method of competition or the act or practice was a willful or knowing violation of said section two."

sentation may be "intentional" yet not "willful or knowing."

 Fortunately, this facially difficult distinction is made considerably easier by asking, as has the Massachusetts Appeals Court, whether the party committing the intentional misrepresentation was "genuinely hopeful of eventually fulfilling his contract ... or [was] deliberately deceptive and entirely disdainful of his commitments," with only the latter having punitive damages levied against him. *VMark Software*, 37 Mass. App.Ct. at 623–24, 642 N.E.2d 587 (internal citations omitted). In this case, despite all of its promises from 1991 on, Dooyang had absolutely no intention of fulfilling its contract to pay for services at any time after the receipt of the first invoice if the project did not prove to be viable.[4] Because I have found specifically that Dooyang deliberately led ADL to believe that it would pay the invoices at some time, even after it had abandoned any intent to do so, and further that Dooyang acted disdainfully of its commitments as it exhorted ADL to be patient, this Court labels Dooyang's conduct as "willful or knowing" within the meaning of the statute and assesses multiple damages against it.

Dooyang can find no comfort in the few cases that have found intentional misrepresentations that, while violative of 93A, did not amount to willful or knowing misconduct justifying multiple damages. In *VMark Software*, the Massachusetts Appeals Court reversed an order of 93A multiple damages against a computer software licensor which misrepresented the quality of its product. 37 Mass.App.Ct. at 624, 642 N.E.2d 587. Though the Appeals Court fully agreed that the licensor made representations that it knew not to be true, it decided that the licensor "was misguidedly insincere but fundamentally well-intentioned" when the company made the misrepresentations. *Id.* The Appeals Court characterized the misconduct in the case as "an inept blend of hopeful dissembling and dogged bumbling," *id.* at 623, 642 N.E.2d 587, and, as such, held that "[s]uch undesirable, but not reprehensible, conduct" did not require punitive damages. *Id.* at 624, 642 N.E.2d 587. The First Circuit

faced similar facts when it reversed a 93A award of multiple damages against a defendant who "simply ignored the problem hoping it would go away." *Cambridge Plating*, 85 F.3d at 770–71 (referring to a vendor who knowingly provided a defective product and remained silent about a possible cure for the defect).

Dooyang attempts to portray its behavior as "relatively innocent," arguing that "[a]t worst, Dooyang withheld payment from a consultant who had already been paid $2.2 million and whose advice had led it into a financial disaster." (Dooyang Dkt. # 169 at 35.) But it *is* worse: there is "something more" than a mere refusal to pay or "hopeful dissembling" or "dogged bumbling." The existence of bad faith conduct amounting to commercial extortion, which drove ADL to costly litigation as its only method of recoupment, propels this case beyond these single-damages cases to the level of "callous" intentional conduct that directs multiple damages. *Heller v. Silverbranch Constr. Corp.*, 376 Mass. 621, 627, 382 N.E.2d 1065 (1978).

The facts of this case are far closer and uncannily similar to 93A cases in which courts have had no trouble awarding multiple damages. Punitive sanctions were upheld where a defendant misrepresented facts in order to induce the plaintiff to reduce a fee for professional services and, critically to this case, "coerced the plaintiff, after receiving the plaintiff's services, into granting an extended payment schedule with which the defendant repeatedly failed to comply." *Multi Technology, Inc. v. Mitchell Management Sys., Inc.*, 25 Mass.App.Ct. 333, 336, 518 N.E.2d 854 (1988); *review denied*, 402 Mass. 1101, 521 N.E.2d 398 (1988). The First Circuit affirmed an award of punitive damages based on a trial court's finding that defendants "had withheld monies which they legally owed as a form of extortion—to force [the plaintiff] to do what otherwise it could not be legally required to do." *Pepsi–Cola Metro. Bottling*, 754 F.2d at 18, *quoted in Anthony's Pier Four*, 411 Mass. at 475, 583 N.E.2d 806. The weight of authority subjects defendants with similar degrees of culpability as Dooy-

---

4. I do not find credible the claim that ADL overbilled Dooyang or that Dooyang failed to pay for services because it in good faith believed

there was overbilling. The jury appropriately rejected this claim.

ang to punitive damages. *See, e.g., Wang Laboratories, Inc. v. Business Incentives, Inc.,* 398 Mass. 854, 860–61, 501 N.E.2d 1163 (1986) (concluding that a firm's effort to obtain the benefits of a contract in "disregard of known contractual arrangements mandates multiple damages as a matter of law"); *Datacomm Interface,* 396 Mass. at 780, 489 N.E.2d 185 ("Actions involving fraudulent representations in knowing disregard of the truth encompass culpable, 'willful' behavior under the statute."); *Computer Sys. Eng'g, Inc. v. Qantel Corp.,* 571 F.Supp. 1365, 1376 (D.Mass.1983) ("a false representation made either knowingly or in reckless disregard for truth or falsity" is "willful or knowing" rather than "relatively innocent"), *aff'd,* 740 F.2d 59 (1st Cir.1984).

■ As a result, Dooyang must pay ADL double damages. The statute directs courts to award "up to three, but not less than two" times the amount of actual damages after a finding of a willful or knowing violation of the statue. Mass. Gen. Laws ch. 93A, § 11. The amount of punitive damages is "[b]ased on the egregiousness of each defendant's conduct." *Kansallis Fin. Ltd. v. Fern,* 421 Mass. 659, 675, 659 N.E.2d 731 (1996) (quoting *Int'l Fidelity,* 387 Mass. at 853, 443 N.E.2d 1308). Egregiousness cannot be measured in a vacuum. As such, one factor in my decision is that the egregiousness of Dooyang's conduct is lessened by the troubling conduct of ADL, which placed itself in the untenable position of claiming to use "best efforts" on Dooyang's behalf while advising CVG how to negotiate the best deal with competing investors. *Cf. Pepsi–Cola Metro. Bottling,* 754 F.2d at 18–19 (commenting on plaintiff's conduct as a possible mitigating factor in deciding the wrongfulness of defendant's conduct). I hasten to add that there was no evidence that Dooyang was ultimately damaged by this conflict of interest (not even ALCOA's smelter was built) or that it had the better project which deserved the subsidy more than ALCOA. Also, Dooyang is hard-pressed to complain about a conflict of interest that it bargained for. Nevertheless, the egregiousness of Dooyang's conduct, measured in light of the nature of the entire business relationship between the parties, merits an award of double damages.

Having found a violation of 93A, the Court also assesses attorneys fees and costs against Dooyang. *Datacomm,* 396 Mass. at 780, 489 N.E.2d 185.

### ORDER

Based on the above Findings of Fact and Conclusions of Law this Court **ORDERS:**

1. That judgment enter in favor of Arthur D. Little, Inc. and against Dooyang Corporation, Dooyang America, Inc. and Dooyang International, Inc. on Count One of the Complaint (Breach of Contract) in the amount of $460,000.00 plus statutory interest accruing from the time of the breach (*i.e.,* July 1, 1991) pursuant to M.G.L. c. 231 § 6C ($460,000 plus simple interest of 1 percent per month), plus Arthur D. Little, Inc.'s costs;

2. That judgment enter in favor of Arthur D. Little, Inc. and against Dooyang Corporation, Dooyang America, Inc. and Dooyang International, Inc. on Count Six of the Complaint (M.G.L.c.93A) for an additional $460,000.00, representing a doubling of actual damages (without interest), plus the amount of Arthur D. Little, Inc.'s reasonable attorneys fees and costs;

3. If the parties are able to agree on the amount of Arthur D. Little, Inc.'s reasonable attorneys fees and costs, they shall notify the Court within 10 days. Otherwise, within 15 days Arthur D. Little, Inc. shall submit an affidavit setting forth its reasonable attorneys fees and costs incurred in this action and that, within 7 days thereafter, Dooyang may submit any objection. If an objection is submitted by Dooyang then Arthur D. Little, Inc. shall have 7 days thereafter to submit any rebuttal;

4. That judgment enter in favor of Arthur D. Little, Inc. and against Dooyang Corporation, Dooyang America, Inc. and Dooyang International, Inc. on all of Dooyang's counterclaims; and

5. The Clerk shall promptly enter judgment on this Order.

**SO ORDERED.**