TECHNOLOGIES, S.A. and Quotium Technologies, S.A., Plaintiffs,

v.

CYRANO, INC., Defendant.

Civil Action No. 02–11416–JLT.

United States District Court, D. Massachusetts.

Oct. 10, 2006.

Memorandum and Order on Reconsideration Nov. 13, 2006.

---

Stephen Y. Chow, Michael K. Sugrue, Burns & Levinson LLP, Joan M. Griffin, McDermott, Will & Emery LLP, Daniel C. Winston, Choate, Hall & Stewart, Boston, MA, Christine Marie Griffin, Wolf, Block, Schorr & Solis-Cohen, LLP, Boston, MA, for Cyrano, Inc.

Mayeti Gametchu, Kevin J. O'Connor, John R. Pagliaro, Paragon Law Group LLP, Boston, MA, Michael A. McCann, Paragon Law Group, LLP, Cambridge, MA, for Quotium Technologies, S.A. and Technologies, S.A.

## *MEMORANDUM*

TAURO, District Judge.

## Background

In mid–2002, Plaintiff Quotium Technologies, S.A. ("Quotium"), a French corporation, and its parent company, Technologies, S.A., brought suit against Defendant Cyrano, Inc. ("Cyrano")[1] for violating Quotium's intellectual property rights in two pieces of software. These software products, known as Workbench and Production, provide added functionality to another database application. Cyrano cross-claimed, asserting its had the right to distribute the software outside of Continental Europe.

After this court denied cross motions for preliminary injunctions and Defendant's Motion for Summary Judgment, Cyrano ceased participating in this case. On December 6, 2004, the court defaulted Cyrano. Cyrano reappeared with new counsel on February 15, 2005, but took no action with respect to the case. On February 23, 2005, this court granted Quotium's motion to dismiss Cyrano's counter-claim, and entered a Default Judgment against Cyrano. The court left the amount of damages to be determined at a subsequent hearing.[2]

On February 27, 2006, and April 3, 2006, the parties presented and argued the issue of damages to the court. This memoran-

---

1. As a result of the prior injunctive relief granted in this litigation, Cyrano Inc. is now known as Vedant, Inc. Quotium's motion for a retitling of the proceedings considering this change has been denied. *Order*, Paper # 196.

2. *See Fed.R.Civ.P.* 55 (2006).

Therefore, this memorandum will refer to the Defendant as Cyrano.

dum addresses only the issue of damages. As discussed in court and in the parties respective filings, the issue of prejudgment interest and the computation of attorney's fees will be addressed in a subsequent ruling.

Prior to 2001, Cyrano, S.A., a French corporation owned the intellectual property rights to Workbench and Production.[3] This software is used in conjunction with a database produced by a company known as Sybase.[4] Cyrano, S.A., licenced the distribution rights of Workbench and Production to Cyrano, Inc., which marketed and supported this software in the U.S. and elsewhere.[5]

Cyrano, S.A., entered liquidation in France on June 11, 2001.[6] After some wrangling, Quotium and its parent company emerged with the intellectual property rights to the software in question, having paid (currency symbol) 200,000 at auction.[7] Nonetheless, Cyrano, Inc., continued its U.S. operations. Indeed, once the present litigation commenced, Cyrano took the position that its exclusive license was not extinguished by liquidation, and that it had the exclusive right to distribute in the U.S. as Quotium's licensee.

While failing to defend the present action, Cyrano did secure a ruling from the Paris Appeals Court in June 2004 that the license was not extinguished in liquidation.[8] This court has recognized that this ruling could constitute a meritorious defense to Plaintiffs' claims.[9] Nonetheless, as reconsideration under Rule 60(b) requires a good explanation for a failure to defend the case, in addition to a meritorious defense, this court refused to lift the Default Judgment.[10]

**Discussion**

Quotium has submitted four alternative measures of damages, a request for treble damages, and a request for attorney's fees and prejudgment interest.

*Damages based on projections*

In December 2001, when it appeared that Quotium would acquire Workbench and Production from the French liquidation, Scott Almeda, then Chief Operating Officer of Cyrano, Inc., and Hubert de Lacvivier, general manager of Quotium, met to discuss collaborative opportunities.[11] Prior to this meeting, Mr. Almeda produced a document detailing Cyrano's projected revenues and costs.[12] These projections were based on Cyrano's previous year's sales figures.[13] Quotium contends that Cyrano should be bound to their own projections as the court considers Quotium's lost profits.

Using the projections, Mr. de Lacvivier extracted annual revenue and cost figures for Workbench and Production.[14] He proposes awarding damages for the three years and nine months between the start of infringement in May 2002 and the dam-

---

3. Testimony of Mr. Almeda, Transcript of April 3, 2006, Damages Hearing, at 87:7–19. [Hereinafter, citation will appear: Almeda, Tr. II at 87:7–19].

4. de Lacvivier, Tr. I at 32:16–17.

5. Almeda, Tr. II at 90:5–13.

6. Plaintiffs' Exhibit 2, at 1.

7. de Lacvivier, Tr. I at 39:1–3 and 93:2–4

8. Defendant's Exhibit G; Almeda, Tr. II at 127:11–16.

9. *Memorandum*, Paper # 144, at p. 12.

10. *Id.*

11. de Lacvivier, Tr. I at 25:9–27:11.

12. Plaintiffs' Exhibit # 1; de Lacvivier, Tr. I at 28:1–29:2.

13. Id. at 30:8–31:18.

14. Id. at 60:13–61:6.

ages hearing in February 2006.[15] Based on these calculations, Quotium asks the court to find its actual damages to be either royalties based on the projected revenues from distributing the software ($2,455,991) or lost profits based on the projected revenues and costs ($1,982,738).

■ Actual damages, whether they be for violation of trademark rights, copyright, or unfair competition laws, must be rationally based on evidence and not mere speculation.[16] Quotium argues that because Cyrano's projections are based on actual sales data, they serve as a rational basis this court can use to award compensatory damages. Both parties rely on the same precedent to state the applicable rule of damages. In *Computer Systems*,[17] the First Circuit upheld a jury award of damages based on a defendant's projected profits for it own franchisee:

> [Defendant] argues that [Plaintiff's] proof of lost profits was too speculative to support an award because [Plaintiff] had no previous earnings history as a [Defendant] distributor. It is true that Massachusetts law does not permit an award for lost profits to be based on "conjecture, surmise, or hypothesis." But Massachusetts law does permit proof of lost profits for a new business to be established through the testimony of experts. As we have recently observed in the context of federal law, "damages for lost profits need not be proved with mathematical certainty, pro-

vided an award has a rational basis in the evidence." Massachusetts law is the same. Moreover, "where defendant's wrongdoing created the risk of uncertainty, the defendant cannot complain about imprecision." [18]

In sum, projections produced by a defendant can be used against him to construct a damage award, especially where the defendant is responsible for the confusion. In the *Computer Systems* case, the data, while prepared by the defendant, projected the plaintiff's expected business. Here, the projections are Cyrano's estimates of its own business potential. Furthermore, in *Computer Systems*, the plaintiff presented an expert who explained the projections' reliability.[19]

■ In *Computer Systems*, the First Circuit accepted that a jury's damage award could be reasonably based on projections. It did not rule that a fact finder must accept projections. Other precedents cited by Quotium merely show that projections *can* be a reasonable basis for a jury award.[20] The projections in the present case, however, do not bear sufficient indicia of reliability.

As Defendant repeatedly argues, Plaintiffs could not expect to immediately assume Defendant's sales once they acquired Defendant's intellectual property. While Quotium did show that it is a well-funded company with capability to successfully market this type of software,[21] it does not follow that Quotium would be able to

---

15. Id. at 53:1–55:18, 64:14–18.

16. *See 4–14 Nimmer on Copyright* § 14.02[A][1] (2006); 3 –14 Jerome Gilson, et al., *Trademark Protection and Practice* § 14.03[3][a] (2006). *See also Computer Systems Engineering, Inc. v. Qantel Corp.*, 740 F.2d 59, 67 (1st Cir.1984).

17. *Computer Systems Engineering, Inc. v. Qantel Corp.*, 740 F.2d 59 (1984).

18. *Id.* at 67.

19. *Id.* at 66.

20. *See e.g., Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384–85 (Fed. Cir.2001) (in a patent case, accepting defendant's projections as a reasonable basis that a jury could have used to compute a reasonable royalty that could have been obtained at hypothetical pre-infringement negotiations).

21. de Lacvivier, Tr. I at 72:7–17.

achieve revenues and costs comparable to those achieved by Cyrano.

Workbench and Production are pieces of software designed to work with Sybase's software.[22] Furthermore, Workbench and Production exist among many competing products, some of which are free.[23] Because of these factors, the demand for these products depends highly on the customers' belief that the software will operate properly with Sybase's software. The established technical relationship with Sybase and the support relationship with customers is essential to market success.[24] Quotium may have been able to develop these relationships absent the consumer confusion.[25] But, there is no reason to believe that they would have been able to do it in a way that resembled the income and expenditures of Cyrano. In short, the intellectual property rights to Workbench and Production are not simply cash-generating assets. To derive profits, a company must exist around those assets. While Quotium could have developed such a business, this court can not make a rational estimation of that business's financial prospects based on Cyrano's established business record.

Secondly, the slump in the software market in late 2001 and early 2002 renders the projections even more unreliable.[26] Mr. de Lacvivier, manager of Quotium, admitted that, prior to the liquidation, Workbench and Production's market share was "very dynamically changing, for the worst actually."[27] Although the projections were transmitted from Mr. Almeda of Cyrano to Mr. de Lacvivier in December 2001, they were based on previous sales data.[28] The plaintiff is the party that bears the responsibility of establishing a rational basis for the damages award. But, Quotium has simply Cyrano's presented the projections without expert analysis explaining their reliability. In fact, it appears that Mr. de Lacvivier never questioned the foundation for the numbers provided by Mr. Almeda.[29] Without an explanation from Quotium about how Cyrano's pre-September 2001, sales figures serve as a reliable foundation for Quotium's future sales, the projections are too speculative.

Third, the projections indicate nearly two million dollars in lost profit over the subsequent 3.75 years after the acquisition.[30] In March 2002, Plaintiffs obtained a final court ruling approving their purchase of Workbench and Production for (currency symbol) 200,000 at a competitive liquidation sale.[31] Even considering uncertain market conditions, this price suggests that the projections are not realistic.[32] If at the time, it was reasonably possible to project millions in profits, why would the assets have sold for so little? A ten fold[33]

22. Id. at 32:15–17.

23. Id. at 141:19–22.

24. Green, Tr. II at 247:14–21.

25. Quotium has hired two former Cyrano employees. De Lacvivier, Tr. I at 149:18–151:1. Cyrano contends that none of these employees were responsible for the relationship with Sybase, and that the essential employees remained with Cyrano. Almeda, Tr. II at 147:4–148:15. This court does not doubt the ability of the workers at Quotium to successfully market Workbench and Production. The projections would simply not be a rational prediction of the fruits of their efforts.

26. Id. at 99:6–102:7.

27. de Lacvivier, Tr. I at 140:8–14.

28. Id. at 31:13–15.

29. Id. at 111:1–25.

30. Id. at 9:23–10:18.

31. Id. at 93:2–4.

32. Green, Tr. II at 221:6–222:6.

33. Euros were valued at less than a dollar prior to the end of 2002. Yahoo! Currency

windfall seems incredible. Absent a showing by Quotium that the market was inefficient, this court finds that the (currency symbol) 200,000 sale price undermines a finding that the $1,982,738 lost profit projection is reliable.

Fourth, Quotium's own manipulation of the projections demonstrates their conjectural nature. Mr de Lacvivier adjusted the projections to remove restructuring and acquisition costs that Quotium would not have had to bear.[34] He testified that Quotium would not need to restructure as it was new to the business.[35] This argument demonstrates that these data were projections of the costs of Cyrano, not Quotium. No matter the resources of Quotium, it is not plausible that Quotium could attain the same revenue as Cyrano without at least the same level of costs. For instance, it would need to expend substantial marketing dollars to build relationships with clients. While Quotium may not have had to restructure, it would have encountered structuring costs. This court re-ran the projections, re-calculated appropriate percentages of revenues and costs attributable to Workbench and Production, included restructuring and acquisition costs, and determined an expected profit level of $546,911 over the same 3.75 years. This figure is more in line with the price of the assets at auction. Were the court to award this figure, it would simply be substituting its own speculation for that submitted by Quotium. By removing some costs from the projections without an adequate explanation, Quotium has demonstrated the projections' highly speculative nature.

Fifth, Quotium has not reduced its request for lost profits based on its own sales. Quotium's own sales have totaled approximately $100,000, but Quotium has not accounted for this offset in the projections.[36] While the court could attempt to adjust the projections accordingly, this omission serves as further evidence that 2001 projections made by and for Cyrano do not provide a good measure of the actual damages of Quotium.

Quotium argues that the projections are reliable because Mr. Almeda prepared them in contemplation of a contract with Quotium and would have had to stand by them if the contract were executed. But, Mr. Almeda's belief in 2001 that he had prepared an accurate projection of Cyrano's profits is an insufficient basis to establish Quotium's lost profits in 2002 through 2006.

For the above states reasons, Quotium's request for a reasonable royalty or lost profits based on Cyrano's projections is denied as too speculative.

*Damages based on actual sales*

■ As a third alternative measure of damages, Quotium asks for a reasonable royalty on the actual sales made by Cyrano. In this case, the rate of the royalty and the amount of the sales are undisputed. Cyrano has contended throughout this litigation that its exclusive right to distribute the products outside of continental Europe is founded in an exclusive license agreement it signed with Cyrano, S.A. This license provided for a royalty rate of 30%.[37] According to the Paris Appeals Court, this contractual right passed to Quotium in the liquidation sale.[38] None-

---

Converter, http://finance.yahoo.com/currency/convert?from =EUR & to=USD & amt=200000 & t=5y (last visited October 9, 2006).

**34.** de Lacvivier, Tr. I at 61:12–62:25.

**35.** Id.

**36.** Id. at 49:12–17; Green, Tr. II at 218:18–219:6.

**37.** Plaintiffs' Exhibit # 4, Schedule D.

**38.** Defendant's Exhibit # G.

theless, Cyrano contends that it is not liable for this licensing fee because Quotium has not assumed its duties under the contract. That argument is irrelevant as the present action is not one for breach of contract, but rather for unfair competition and copyright and trademark infringement. Cyrano's liability for these claims has been established by Default Judgment. Whether or not Quotium performed under the license, the actual royalty provided for therein serves as an appropriate minimal estimate of the value of the intellectual property rights that Cyrano infringed. Applying the royalty rate to Cyrano's actual sales yields a total of $105,83.[39]

Because Cyrano and Quotium publicly disputed ownership of the software, the market was harmed.[40] A damage award based on actual sales in a damaged market is inadequate. The court is aware of precedent noting that damage awards based on an infringer's sales underestimates damages and unjustly rewards the infringer.[41] Yet where this measure of damages is the only reliable measure available, it must be adopted.

*Willfulness*

Quotium argues that Cyrano's actions constitute willful infringement and warrant an increase of damages. Under trademark law, the court may award up to treble damages as warranted by the circumstances of the case.[42] A finding of willful or knowing unfair trade practices requires double or treble damages under state unfair trade law.[43]

 The entry of default judgment against defendant requires that all factual allegations made in the complaint be taken as true.[44] Quotium pled that Cyrano's violation was deliberate and knowing.[45] A default judgment of willfulness, therefore, could be appropriate. In fact, many other courts have implied willfulness upon a finding of default.[46] At least one court, however, has declined to make such a finding.[47] In the present case, the Default Judgment specifically limited its finding to liability and scheduled a hearing on damages.[48] Because both parties did appear and present evidence on the issue of willfulness, this question can and should be deter-

39. de Lacvivier, Tr. I at 69:9–70:6.

40. Almeda, Tr. II at 64:4–24, 65:10–66:18, and 68:9–16.

41. *See e.g., Getaped.Com, Inc. v. Cangemi*, 188 F.Supp.2d 398, 403–04 (S.D.N.Y.2002); *Calamari Fisheries, Inc. v. The Village Catch, Inc.*, 698 F.Supp. 994, 1013 (D.Mass.1988).

42. 15. U.S.C. § 1117(a) (2006).

43. Mass. Gen. Laws ch 93A § 11 (2006).

44. *McKinnon v. Kwong Wah Restaurant*, 83 F.3d 498, 506 (1st Cir.1996).

45. *Complaint* at 2–3, Paper # 1.

46. *See Tiffany (NJ) Inc. v. Luban*, 282 F.Supp.2d 123, 124 (S.D.N.Y.2003); *Arista Records, Inc. v. Beker Enters.*, 298 F.Supp.2d 1310, 1313 (S.D.Fla.2003) (listing four cases finding willfulness in a default).

47. *Doehrer v. Caldwell*, No. 79 C 394, 1980 WL 1158 at *2 (N.D.Ill.1980) ("While a default judgment is determinative on the issue of infringement, and establishes, as a matter of law, that plaintiff has a right to general damages, ... the requirements for lifting the ceiling on statutory damages have not been satisfied. Before increased damages may be awarded under Section 504(c)(2), the copyright owner must sustain the burden of proving, and the court must make a finding, that the infringement was committed willfully. There has been no evidence to support a finding of willful infringement here.... Additionally, the court did not make any finding of willfulness when it entered the default judgment.") (citations omitted).

48. *Order of Default Judgment as to Liability*, Paper 111.

mined without regard to the Default Judgment.

■ This court's contempt rulings against Defendant found willful violations of this court's injunctive orders.[49] Refusal to comply with a court order does not however constitute evidence that a party willfully infringed another's intellectual property rights. In fact, Cyrano's intransigence was based on its continued claim that it was the rightful licensee. Accordingly, this court will not consider the prior contempt ruling in its decision on willfulness.

■ As noted above, this court has recognized that the ruling of the Paris Appeals Court could constitute a valid defense to the underlying charge of infringement. Cyrano has repeatedly argued throughout this proceeding that they have the exclusive non-European rights to distribute the software. While Quotium argues that Cyrano's claim of license rights was not made in good faith, it is difficult to make a finding of willful infringement in light of the ruling of the Paris Appeals Court.

Quotium presented a number of arguments in favor of a finding of willfulness. First, Alberto Saynes, a former employee of Cyrano and current employee of Quotium, testified that Mr. Almeda told his employees that if Cyrano was unable to acquire the rights to the software, Cyrano "can scorch earth the relationship with Sybase and the customers so when they get the product, they won't get anything,

any value basically."[50] Mr. Almeda denies making such a comment.[51] Cyrano maintains that this comment does not make sense because Mr. Almeda wouldn't have undermined Cyrano's relationship with its essential partner. That assertion is not compelling since Quotium's allegation is that Cyrano would have taken such action if it lost its claims.

On this point, Mr. Almeda is not as credible as Mr. Saynes. Nonetheless, the making of such a statement does not constitute willfulness absent evidence that Cyrano willfully destroyed the relationship with Sybase. Both parties' relationship with Sybase was in fact destroyed, but Cyrano did not deliberately destroy it. Rather, Cyrano continued to market their product in the belief that they had rights to do so. The fact that both Cyrano and Quotium were offering the same product harmed the relationship with customers and Sybase.[52]

Cyrano sent many letters to customers claiming that it completely owned Workbench and Production.[53] Similarly, Cyrano claimed that Quotium had no claim to ownership.[54] Cyrano argued that it was just referring to ownership of the exclusive license rights to distribute in the relevant markets. Upon interrogation by this court, Mr. Almeda admitted that most people would not talk about "ownership of rights."[55] Cyrano's explanations, therefore, are unconvincing. But, even if Cyrano did tell customers that Cyrano owned Workbench and Production, it does not

---

**49.** *Order of Contempt,* Paper # 180.

**50.** Saynes, Tr. II at 23:24–24:1. "Scorch earth" refers to a military tactic whereby one army destroys everything that could be of use to another army, including food and supplies. Mr. Saynes testified that Mr. Almeda compared Cyrano's situation to the Russians in World War II, who burned everything rather than allow the advancing German army to seize it. Id. at 24:16–25:5.

**51.** Almeda, Tr. II at 134:6–14.

**52.** Id. at 73:21–74: 10.

**53.** Id. at 53:9–12, 53:18–54:5, 54:14–25; Plaintiffs' Exhibit 7.

**54.** Id. at 54:14–25.

**55.** Id. at 208:23–209:15

follow that they were intentionally seeking to destroy the market. Rather, Cyrano could have been seeking to claim the market for themselves, acting with verbal imprecision in the good faith belief that they did have the exclusive right to the relevant market. While Cyrano may have engaged in intentional misrepresentation, they were not necessarily engaged in willfully and wrongfully appropriating the market. This distinction, while a bit pedantic, is established in Massachusetts unfair trade law. In a contract case, the United States District court for the District of Massachusetts noted:

> A simple finding of intentional misrepresentation "does not automatically trigger punitive damages. There must be something more." ... The law of Chapter 93A, then, has developed the sometimes elusive paradigm that a misrepresentation may be "intentional" yet not "willful or knowing." Fortunately, this facially difficult distinction is made considerably easier by asking, as has the Massachusetts Appeals court, whether the party committing the intentional misrepresentation was "genuinely hopeful of eventually fulfilling his contract ... or [was] deliberately deceptive and entirely disdainful of his commitments," with only the latter having punitive damages levied against him.[56]

Applying that distinction to this case, the question for this court is not merely whether Cyrano told customers that it owned Workbench and Production, but also whether it did so trying to steal the market or, instead, with the hope that some court would decide it was the exclusive licensee. While the Default Judgment establishes Cyrano's liability in this case, the Paris Appeals Court's ruling on the continued existence of the license provides a strong basis for Cyrano's claim that it had a good faith basis to believe that it was the party entitled to exploit the relevant markets.

■ Anticipating this reasoning, Quotium argues that Cyrano's actions during the period in question indicate that it was not acting in the good faith belief that it actually had the rights to the software. Quotium submits that Cyrano only knew that its license was valid after the Paris Appeals Court ruling. A defense that accrues after infringement commences does not bar a finding of willfulness.[57] But, Cyrano's exclusive right was codified in amendments to the license in August 2000 and April 2001.[58] Although it wasn't until later that the French courts ruled that the license survived bankruptcy, it remained operable as a legal instrument during the period of infringement.

Cyrano's claim to exclusive rights to Workbench and Production derive from these amendments.[59] Quotium asserts that these amendments were insider transactions where Cyrano, S.A., essentially gave away its assets to Cyrano, Inc., without shareholder approval and for the purpose of keeping those assets out of liquidation. In support of this claim, Quotium observes that Workbench and Production were not listed as licensed products in the original distributorship agreement.[60] Quotium's own witness's testimony and Cyrano's 1998 agreement with Sybase show that Cyrano was distributing Workbench and Production in the U.S. well before the amendments.[61] Furthermore, the original

---

**56.** *Arthur D. Little Intern., Inc. v. Dooyang Corp.,* 979 F.Supp. 919, 926–27 (D.Mass. 1997) (citations omitted).

**57.** *See Nimmer on Copyright* § 14.04[B][3] (2006).

**58.** Plaintiffs' Exhibit # 4.

**59.** Id.

**60.** Plaintiffs' Exhibit # 4, Schedule A.

**61.** Saynes, Tr. II at 9:4–14; Plaintiffs' Exhibit # 6 (a distribution agreement from 1999 between Cyrano and Sybase).

agreement gave Cyrano rights to "100% of all modules comprising DB Pack," [62] and Quotium's own manager testified that DB Pack contained Workbench and Production.[63]

It appears, therefore, that Cyrano's defense to infringement is founded in the original 1996 agreement, not in the allegedly suspect amendments. Quotium bears the burden of showing willfulness and must convince this court that Cyrano began falsely claiming rights to the software only after acquiring it through insider transactions that Cyrano knew to be fraudulent. While Quotium's arguments might convince a French court to re-examine the amendments, they do not convince this court that Cyrano did not believe it had any rights under the license.

Quotium has identified evidence that it claims show such bad faith. First, Quotium notes that Cyrano did not mention its license rights while the parties were bidding for the assets in liquidation or when Mr. de Lacvivier and Mr. Almeda met in 2001. This negative evidence does not establish that Cyrano did not believe it had the rights to the software. It may simply indicate that Cyrano was interested in acquiring total rights or in exploring a possible relationship with Quotium.

Second, Cyrano's conduct with respect to other contested software allegedly shows knowledge that Cyrano thought it had no rights in Workbench and Productivity. Cyrano, Inc., acquired other software assets ("Test" and "Impact") that were tied up in the Cyrano, S.A., liquidation.[64] In April 2002, Cyrano sent Quotium an infringement letter for this software.[65] Quotium claims that because Cyrano only mentioned its rights to Test and Impact in that letter, it is evidence that Cyrano did not believe it had the rights to Workbench and Production. It would again be improper to draw such a negative inference because Workbench and Production were not relevant to the subject of that letter.

Third, Quotium argues that Cyrano did not mention its license rights until five months after the start of this litigation. However, the record indicates that Cyrano pled its rights in its Answer and Counterclaim.[66]

Fourth, Quotium claims that Mr. Almeda's "scorch the earth" remark provides evidence of lack of good faith. Mr. Saynes contends that Mr. Almeda did not mention the license agreement to his employees.[67] These acts and omissions are evidence that Mr. Almeda did not believe Cyrano had the rights that it claims to have. While simply threatening to "scorch the earth" is not proof of willfulness, the remark does indicate bad faith on the part of Mr. Almeda.

Nonetheless, considering all of the evidence, including Cyrano's pre-liquidation sales of the products, the complex web of rights and claims that existed after liquidation, Cyrano's continued insistence in this litigation that it is the rightful distributor, and the Paris Appeals Court ruling that the agreement survived liquidation, this court is not convinced that Cyrano willfully infringed and willfully destroyed the market for Workbench and Production. While the amendments to the agreements may be invalid, no court has so ruled, and the evidence does not convince this court

---

**62.** Plaintiff's Exhibit # 4, Schedule A.

**63.** de Lacvivier, Tr. I at 54:14–17.

**64.** Almeda, Tr. II at 116:14–24.

**65.** Id. at 172:5–17.

**66.** *Answer to Complaint; Jury Demand and Counterclaim*, Paper # 6, at 9, 14.

**67.** Saynes, Tr. II at 42:15–22.

that Cyrano knew all along that the amendments were invalid. While Mr. Almeda may have acted arrogantly, such an attitude does not equate with willfulness.

Because Quotium has not met its burden of establishing willfulness, the damages award will not be multiplied.

*Attorney's fees and Prejudgment Interest*

Parties are to file arguments and affidavits as to the award of reasonable attorney's fees on or before Nov. 10, 2006. As proposed by Quotium in its recent Opposition to Motion to File Reply Memorandum, the issue of prejudgment interest will be reserved until after Cyrano has an opportunity to brief it. Parties will comply with the attached Order in arguing these issues.

*Other Issues*

■ This court does not accept Cyrano's argument that the cancellation of the "Cyrano" trademark for non-use eliminates Quotium's right to recover under that claim. It is reasonable that Quotium would no longer use the "Cyrano" mark after the extensive confusion in the marketplace. Any cancellation now is not evidence that the mark was not valid and infringed in 2002, and would not upset this court's ruling on Default Judgment or Damages.

Cyrano argues that Quotium failed to state a claim in most of its other counts and seeks to dismiss them. In awarding the Default Judgment, this court determined that Plaintiffs had stated claims under all counts. The Default Judgment carried the legal effect of ruling that Quotium owned the rights in question. It is not disputed that Defendant used the mark in question, distributed the software in question, and made public declarations of its alleged ownership. While this court found that the license gave Cyrano a defense to

willfulness, it has already ruled that it does not excuse the Default Judgment.

**Conclusion**

Having failed to provide a reliable basis for greater damages, Plaintiffs Quotium Technologies, S.A., and Technologies, S.A., are entitled to payment of damages on all counts in the amount of $105,833. This award will not be multiplied.

AN ORDER WILL ISSUE.

*MEMORANDUM AND ORDER*

On October 10, 2006, this court issued a *Memorandum*[1] and *Order* awarding Plaintiff actual damages of $105,833. The court declined to award multiple damages because it was not persuaded Defendant's actions demonstrated the required level of willfulness. In particular, the court noted the Defendant's good faith reliance on apparent rights under a license agreement.

Plaintiff has moved the court for reconsideration, noting that this license agreement only purported to award rights to market the software in question, not to do business under the trademarked name "Cyrano." Upon consideration of the Plaintiffs' *Motion for Reconsideration* [# 222] and reconsideration of the evidence adduced to date, the court makes additional findings of fact and conclusions of law.

Although the license agreement with Cyrano, S.A., gave the Defendant a claim of right to sell the software "Cyrano Workbench" and "Cyrano Production," this license does not purport to grant the Defendant the right to the trademark "Cyrano."[2] Of course, even without explicit rights granted in the license, the Defendant legitimately operated as Cyrano, Inc., prior to the liquidation. After the liquidation sale of Cyrano, S.A., a le-

---

1. *Technologies, S.A. v. Cyrano, Inc.*, No. 02–11416, 2006 WL 2868394 (D.Mass., 2006).

2. Plaintiff's Exhibit # 4; Almeda, Tr. II at 189:13–190:15.

gal maelstrom ensued where all parties vigorously attempted to determine and defend their rights. By continuing to operate under the name of Cyrano, Inc. while ascertaining the complex arrangement of property and licensing rights that the liquidation sale created, the Defendant may have acted uncautiously and over aggressively. Even upon reconsideration of the trademark specific issues, this court is not persuaded that the Defendant willfully engaged in unfair or deceptive trade practices.

The burden of proving damages rests with the Plaintiff, but the measures of damages presented by Plaintiff did not distinguish losses from trademark infringement from losses from unauthorized sales of the software. A finding of willfulness with respect to the use of the trademark would not justify trebling the entire damage award, which was based on software sales that the court has found were not willfully infringing. Because Plaintiff's theories of damages were integrated, this court chooses to analyze whether there is sufficient evidence to support a finding of willfulness with respect to the whole of Defendant's actions. Reaffirming its earlier determination that Defendant's use of the software was made in good faith reliance on the French licenses, and reconsidering Defendant's use of the trademark, this court does not find evidence of willfulness sufficient to justify multiplying Plaintiff's award.

The components of Plaintiff's *Motion for Reconsideration* [# 222] that seek further findings of fact and redress from a typographic error are ALLOWED. To the extent that Plaintiff's motion seeks multiple damages, it is DENIED.

IT IS SO ORDERED.